## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## LUBBOCK DIVISION

| | | |
|---|---|---|
| **STEPHANIE ROBERTSON, Individually and as Personal Representative of the Estate of Dakota Brannen, BOB BRANNEN, and CASONDRA WARREN,** | § § § § § § | |
| *Plaintiffs*, | § § | |
| **v.** | § § | **CIVIL ACTION NO. 5:23-cv-39** |
| **TERRY COUNTY, TEXAS, TIMOTHY CLICK, SCOTT PETERS, YSIDRO JACQUEZ III, NICHOLE FAULKNER, GLORIA RAMIREZ, MINNIE MORALES, ANNIE MCELFRESH, ADRIANNA MOYA, ANNA COLLAZO, KATYE CLARK, MATTHEW FAUBION,** | § § § § § § § § § § § § § § | |
| *Defendants*. | § | |

## <u>PLAINTIFF'S ORIGINAL COMPLAINT</u>

We have never held, and we will not now suggest, that multiple suicides must occur in the same cell before a jail official is required to take preventative measures.

*Converse v. City of Kemah, Texas*, 961 F.3d 771, 777 (5th Cir. 2020)

1

**TO THE HONORABLE UNITED STATES DISTRICT JUDGE:**

COMES NOW, DEBRA WALLER as Personal Representative of the Estate of Rodney Howard, Plaintiff, complaining of TERRY COUNTY, TEXAS, TIMOTHY CLICK, SCOTT PETERS, YSIDRO JACQUEZ III, NICHOLE FAULKNER, GLORIA RAMIREZ, MINNIE MORALES, ANNIE MCELFRESH**,** ADRIANNA MOYA, ANNA COLLAZO, KATYE CLARK, and MATTHEW FAUBION, for causes of action will respectfully show unto the Court as follows:

### SUMMARY

Terry County, Texas and its employees at the Terry County Detention Facility owe a duty under the Fourteenth Amendment to protect pretrial detainees from a known risk of suicide.

Dakota Brannen was a twenty-year-old man who was booked into the Terry County Jail on November 5, 2020. Dakota suffered from serious mental health issues, which were known to the Terry County Jail and the mental health workers from West Texas Centers who contracted with the Terry County Jail to provide mental health care for its inmates. Dakota attempted suicide three separate times while incarcerated in the Terry County Jail and housed in segregation cells: First, on December 17, 2020, next on January 15, 2021, and then on February 5, 2020. The West Texas Centers mental health worker who saw Dakota on February 8, 2021 removed him from suicide watch despite his clear need for help and monitoring. Then on February 26, 2021, while in a segregation cell, not on suicide watch, and not being adequately monitored via video monitoring or face to face cell checks, Dakota spent fifty five minutes tying his bedsheets into a rope, anchoring the rope to his bed frame, throwing the rope over a partial wall in his cell, and testing the strength and height of the noose. No one was monitoring Dakota, so no one stopped him. Dakota hung himself and remained hanging for over an hour before he was found, only because a jailer came to his cell due to his attorney arriving for a visit – not as part of a routine cell check.

Despite the fact that no one had been checking on Dakota, numerous cell checks were fabricated on the log sheet as if they had been doing so. Including, a check that would have allowed the jailer to see Dakota preparing his suicide, which would have allowed Dakota to be stopped and saved, and two other checks while Dakota was hanging in his cell, which could have allowed the jailer to pull him down and provide him with medical attention. Dakota died on February 26, 2021.

This was not the first time a person has died by suicide in a segregation cell in the Terry County Jail due to guards failing to monitor these inmates at elevated risks of self-harm. On September 12, 2019, Rodney Howard was a pretrial detainee who died by suicide in the Terry County Jail following three previous suicide attempts in the jail on August 2, 2019, August 3, 2019, and August 18, 2019. Despite the obvious need to keep Rodney on suicide watch, MHMR personnel removed Rodney from suicide watch and he was left in a segregation cell with access to the items he used to harm and ultimately kill himself, while being unmonitored despite a camera recording the entire process, due to understaffing resulting in one jailer being required to monitor over ninety cameras while performing a litany of other tasks.

Sheriff Timothy Click was on notice that the practices of not monitoring these inmates along with his other policies of understaffing the jail and refusing to remove ligatures from potentially suicidal inmates despite repeated suicide attempts, would lead to serious injury or death, as the Terry County Jail was found non-compliant with cell checks in 2019 as part of a special inspection which found that the jailers in the Terry County Jail failed to conduct face-to-face observations of inmates in holding cells in accordance with the Minimum Jail Standards – the same failures which resulted in Dakota's death and Rodney Howard's death.

Unsurprisingly, due to the clear practice of failing to monitor inmates in the Terry County Jail, on March 4, 2021, only a week after Dakota committed suicide due to the Terry County Jail's

practice of failing to monitor at risk inmates, the Texas Commission on Jail Standards issued another Inspection Report finding that on numerous occasions Terry County staff exceeded the 30-minute requirement to observe inmates known to be assaultive, potentially suicidal, mentally ill, or who have demonstrated bizarre behavior.

Knowing that his jail had a practice of failing to adequately monitor inmates, which in conjunction with the policies regarding housing potentially suicidal inmates with ligatures, had now resulted in multiple deaths, Sheriff Click failed to adopt any policy requiring adequate monitoring during face-to-face cell checks or of the video feed from cells or a change to his policies regarding staffing or potentially suicidal inmates being housed in segregation cells with ligatures such as blankets. As a result, less than eighteen months after Rodney Howard's death, Dakota suffered the same fate.

Plaintiffs now file this lawsuit against Terry County, Texas and these individual defendants for the wrongful death of their son and for violating Dakota's constitutional rights under the Fourteenth Amendment to the United States Constitution to be adequately monitored and protected as a pre-trial detainee.

Plaintiffs pray that a third death will not follow from Terry County's and Sheriff Click's unwillingness to adequately monitor its inmates or remove ligatures from potentially suicidal inmates and ask at what point will enough people die in the Terry County Jail before Sheriff Click adopts new policies and practices to protect the inmates in his custody and care.

# I.
## Parties

1.    Plaintiff Stephanie Robertson is an individual residing in Lubbock County, Texas.

2.    Plaintiff Bob Brannen is an individual residing in Lubbock County, Texas.

3.    Plaintiff Casondra Warren is an individual residing in Lubbock County, Texas.

4.    Defendant Terry County, Texas is a political subdivision of the State of Texas located in the Northern District of Texas. Defendant Terry County, Texas can be served through its County Judge, Tony Serbantez, at 500 West Main, Room 102, Brownfield, TX 79316, or wherever he may be found.

5.    Defendant Timothy Click is an individual residing in Terry County, Texas, and at all times relevant to this lawsuit was the Sheriff at the Terry County Jail and may be served at the Terry County Sheriff's Office, located at 1311 Tahoka Road, Brownfield, Texas 79316, or wherever he may be found. Defendant Click is being sued in his individual capacity.

6.    Defendant Scott Peters is an individual residing in Terry County, Texas, and at all times relevant to this lawsuit was a Jailer at the Terry County Jail and may be served at the Terry County Sheriff's Office, located at 1311 Tahoka Road, Brownfield, Texas 79316, or wherever he may be found. Defendant Peters is being sued in his individual capacity.

7.    Defendant Ysidro Jacquez III is an individual residing in Terry County, Texas, and at all times relevant to this lawsuit was a Jailer at the Terry County Jail and may be served at the Terry County Sheriff's Office, located at 1311 Tahoka Road, Brownfield, Texas 79316, or wherever he may be found. Defendant Jacquez is being sued in his individual capacity.

8.    Defendant Nichole Faulkner is an individual residing in Terry County, Texas, and at all times relevant to this lawsuit was a private nurse practitioner that worked with the Terry County Jail through independent contractor relationships, and may be served at her employer, West

Texas Centers, located at 502 W Broadway St, Brownfield, TX 79316, or wherever she may be found. Defendant Faulkner is being sued in her individual capacity.

9.     Defendant Gloria Ramirez is an individual residing in Terry County, Texas, and at all times relevant to this lawsuit was a private nurse practitioner that worked with the Terry County Jail through independent contractor relationships, and may be served at her employer, West Texas Centers, located at 502 W Broadway St, Brownfield, TX 79316, or wherever she may be found. Defendant Ramirez is being sued in her individual capacity.

10.     Defendant Minnie Morales is an individual residing in Terry County, Texas, and at all times relevant to this lawsuit was a private nurse practitioner that worked with the Terry County Jail through independent contractor relationships, and may be served at her employer, West Texas Centers, located at 502 W Broadway St, Brownfield, TX 79316, or wherever she may be found. Defendant Morales is being sued in her individual capacity.

11.     Defendant Annie McElfresh is an individual residing in Terry County, Texas, and at all times relevant to this lawsuit was a private nurse practitioner that worked with the Terry County Jail through independent contractor relationships, and may be served at her employer, West Texas Centers, located at 502 W Broadway St, Brownfield, TX 79316, or wherever she may be found. Defendant McElfresh is being sued in her individual capacity.

12.     Defendant Adrianne Moya is an individual residing in Terry County, Texas, and at all times relevant to this lawsuit was a private nurse practitioner that worked with the Terry County Jail through independent contractor relationships, and may be served at her employer, West Texas Centers, located at 502 W Broadway St, Brownfield, TX 79316, or wherever she may be found. Defendant Moya is being sued in her individual capacity.

13.     Defendant Anna Collazo is an individual residing in Terry County, Texas, and at all times relevant to this lawsuit was a private nurse practitioner that worked with the Terry County Jail through independent contractor relationships, and may be served at her employer, West Texas Centers, located at 502 W Broadway St, Brownfield, TX 79316, or wherever she may be found. Defendant Collazo is being sued in her individual capacity.

14.     Defendant Katye Clark is an individual residing in Terry County, Texas, and at all times relevant to this lawsuit was a private nurse practitioner that worked with the Terry County Jail through independent contractor relationships, and may be served at her employer, West Texas Centers, located at 502 W Broadway St, Brownfield, TX 79316, or wherever she may be found. Defendant Clark is being sued in her individual capacity.

15.     Defendant Matthew Faubion is an individual residing in Terry County, Texas, and at all times relevant to this lawsuit was a private medical doctor that worked with the Terry County Jail through independent contractor relationships, and may be served at his employer, West Texas Centers, located at 502 W Broadway St, Brownfield, TX 79316, or wherever he may be found. Defendant Faubion is being sued in his individual capacity.

## II.
## Jurisdiction and Venue

16.     The Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 1343 since Plaintiffs are suing for relief under 42 U.S.C. § 1983.

17.     Venue is proper in the Northern District of Texas pursuant to 28 U.S.C. § 1391 because the some of the Defendants are domiciled and/or reside in the Northern District of Texas, and all or a substantial part of the cause of action accrued in the Northern District of Texas in Terry County, Texas.

### III.
### Facts and Allegations

18.    Dakota Brannen, (hereinafter referred to as "Dakota") was a twenty-year-old man who died on February 26, 2021, in the Terry County Jail after being unmonitored with access to a ligature and tie off point and enough time to tie a noose and hang himself, all on video in his cell.

19.    This occurred due to the practices at the Terry County Jail, under Sheriff Timothy Click, of failing to monitor inmates through adequate face to face checks or by watching video feeds of the cells, despite these inmates being known suicide risks due to having attempted suicide multiple times in the Terry County Jail.

20.    At all times relevant to this lawsuit, Dakota was held as a pre-trial detainee in the Terry County Jail.

21.    At all times relevant to the subject matter of this litigation, Defendant Terry County, Texas (hereinafter referred to as the "County") operated the Terry County Jail where Dakota was detained.

22.    At all times relevant to the subject matter of this litigation, Defendant Timothy Click (hereinafter referred to as "Click") was the Sheriff of Terry County.

23.    At all times relevant to the subject matter of this litigation, Defendant Scott Peters (hereinafter referred to as "Peters") was an employee of the County, working in the Terry County Jail, and who was following the County's policies, practices, customs, and training implemented by Click.

24.    At all times relevant to the subject matter of this litigation, Defendant Ysidro Jacquez III (hereinafter referred to as "Jacquez") was an employee of the County, working in the Terry County Jail, and who was following the County's policies, practices, customs, and training implemented by Click.

25.    At all times relevant to the subject matter of this litigation, Defendant Nichole Faulkner (hereinafter referred to as "Faulkner") was a private nurse practitioner that worked with MHMR through independent contractor relationships.

26.    At all times relevant to the subject matter of this litigation, Defendant Gloria Ramirez (hereinafter referred to as "Ramirez") was a private nurse practitioner that worked with MHMR through independent contractor relationships.

27.    At all times relevant to the subject matter of this litigation, Defendant Minnie Morales (hereinafter referred to as "Morales") was a private nurse practitioner that worked with MHMR through independent contractor relationships.

28.    At all times relevant to the subject matter of this litigation, Defendant Annie McElfresh (hereinafter referred to as "McElfresh") was a private nurse practitioner that worked with MHMR through independent contractor relationships.

29.    At all times relevant to the subject matter of this litigation, Defendant Adrianne Moya (hereinafter referred to as "Moya") was a private nurse practitioner that worked with MHMR through independent contractor relationships.

30.    At all times relevant to the subject matter of this litigation, Defendant Anna Collazo (hereinafter referred to as "Collazo") was a private nurse practitioner that worked with MHMR through independent contractor relationships.

31.    At all times relevant to the subject matter of this litigation, Defendant Katye Clark (hereinafter referred to as "Clark") was a private nurse practitioner that worked with MHMR through independent contractor relationships.

32.    At all times relevant to the subject matter of this litigation, Defendant Matthew Faubion (hereinafter referred to as "Defendant Faubion") was a private nurse practitioner that worked with MHMR through independent contractor relationships.

33.    People in the custody of the Terry County Jail are dependent upon the County and their employees to protect them from risks of serious harm, including suicide.

34.    The Fifth Circuit has repeatedly held that pretrial detainees have a Fourteenth Amendment right to be protected from a known risk of suicide. *Converse v. City of Kemah, Texas*, 961 F.3d 771, 775 (5th Cir. 2020); *Jacobs v. W. Feliciana Sheriff's Dep't*, 228 F.3d 388, 393 (5th Cir. 2000); *Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1996).

35.    And it is well-settled law that jail officials violate this right if "they had gained actual knowledge of the substantial risk of suicide and responded with deliberate indifference." *Converse*, 961 F.3d at 775 *Hare*, 74 F.3d at 650; *Jacobs*, 228 F.3d at 393.

36.    As the Fifth Circuit stated, "[w]e have never held, and we will not now suggest, that multiple suicides must occur in the same cell before a jail official is required to take preventative measures." *Converse*, 961 F.3d 771, 777 (5th Cir. 2020).

37.    However, in this case, Dakota attempted multiple suicides in the same type of segregation cell before ultimately being successful on his fourth attempt.

### November 5, 2020

### Dakota was Booked into the Terry County Jail

38.    Dakota was booked into the Terry County Jail on November 5, 2020. On his suicide screening form he acknowledged (1) that he had previously attempted suicide; (2) that he currently "felt hopeless or had nothing to look forward to;" (3) that prior to his arrest he felt "down, depressed, or have little interest or pleasure in doing things;" (4) that he has "nightmares,

flashbacks or repeated thoughts or feelings related to PTSD or something terrible from your past;" (5) that he felt "extremely worried you will lose your job, position, spouse, significant other, custody of your children due to arrest" and specifically indicated a fear of losing his family.

## November 24, 2020

### Jail and Mental Health Staff are on Notice that Dakota Needs Monitoring

39.    On November 24, 2020, an Initial Psychiatric Evaluation was performed by Defendant Minnie Morales, APN, DEA, which she signed at 4:33 PM.

40.    In the narrative section of her evaluation, Defendant Morales noted that Dakota stated, "I need to be in the hospital and not here."

41.    The evaluation indicated the following:

   a.  "Patient reports that he is not "himself," and knows that he needs to take medications."

   b.  "Daily hallucinations of demeaning comments and fleeting SI."

   c.  "Will talk to his gf when he feels down and suicidal"

   d.  "Suicide attempts: States several times in the past couple of years."

42.    The evaluation indicated a diagnoses of "Major depressive disorder, severe."

43.    The evaluation also noted, "agreeable to start medications to address her mood and sleep. Common side effects and risks explained to patient.

44.    At this evaluation, Dakota was started on Abilify.

45.    According to www.abilify.com: "Antidepressant medicines may increase suicidal thoughts or behaviors in some children, teenagers, and young adults, especially within the first few months of treatment or when the dose is changed. Depression and other serious mental illnesses are themselves associated with an increase in the risk of suicide. Patients on antidepressants and

their families or caregivers should watch for new or worsening depression symptoms, unusual changes in behavior, or thoughts of suicide. Such symptoms should be reported to the patient's healthcare provider right away, especially if they are severe or occur suddenly."

46.    Dakota was also started on Trazodone.

47.    According to www.medlineplus.gov[1]: "Children, teenagers, and young adults who take antidepressants to treat depression or other mental illnesses may be more likely to become suicidal than children, teenagers, and young adults who do not take antidepressants to treat these conditions. You should know that your mental health may change in unexpected ways when you take trazodone or other antidepressants even if you are an adult over age 24. You may become suicidal, especially at the beginning of your treatment and any time that your dose is increased or decreased."

48.    "Follow up 4 weeks, educated patient that if symptoms worsen or becomes suicidal/homicidal to call the crisis line."

49.    Accordingly, Dakota was being started on two medications, Abilify and Trazodone, which cause suicidal ideations in new users.

50.    Each of the MHMR personnel who evaluated or assessed Dakota following this November 24, 2020 evaluation would have seen in his file by reading his medication list and seeing this evaluation that Dakota was being prescribed Abilify and Trazodone as of November 24, 2020.

51.    Each of the MHMR personnel who evaluated or assessed Dakota following this November 24, 2020 evaluation would have known that the side effects of Abilify and Trazodone include suicidal ideations by way of their training, licensures, and experience as mental health professionals.

---

[1] https://medlineplus.gov/druginfo/meds/a681038.html

**December 17, 2020**

**First Suicide Attempt
By Hanging**

52.    On December 17, 2020, Dakota attempted suicide by hanging himself with two bedsheets while in a segregation cell, not on suicide watch, and not being adequately monitored.

53.    If he had been adequately monitored through use of the video feed in his segregation cell or by face to face checks, he would have been seen preparing the noose to hang himself due to the length of time it takes to tie a noose using bedsheets, rig the noose to a gallows, test the strength and height of the noose, and then actually hang oneself as indicated by the video of Dakota successfully committing suicide by hanging on February 26, 2021 which showed a process of fifty five minutes preparing in his cell.

**December 17, 2020**

**Initial Mental Health Jail Screening and Triage Service**

54.    On December 17, 2020, following Dakota's suicide attempt by hanging with 2 sheets, a Mental Health Jail Screening and Triage Service was conducted by Defendants Annie McElfresh, QMHP-CS and Ana Maria, Collazo, LPC, QMHP, which was signed at 3:02 AM.

55.    In the Presenting Problems section, it was noted that,

   a.    "Dakota was assessed at Terry County Jail after he attempted suicide by hanging with 2 sheets."

   b.    "Dakota stated "everything just got to me tonight, I have had a really hard life.""

   c.    "Dakota stated that he is in administrative segregation and has no support systems available."

   d.    "Dakota reported hearing command voices that tell him to hurt himself."

   e.    "Dakota reported he has been taking Abilify and Trazodone for about 2 weeks."

56.     The Suicide Assessment indicated: Current suicide attempt (significant/lethal nature).

57.     The Risk Estimation/Risk Indicators were noted as:

    a.  Wanting to die

    b.  Isolating

    c.  Signs of depression

    d.  History of abuse

    e.  Relationship issues

    f.  Hopelessness

    g.  Degree of planning

58.     The Recommended interventions, follow-ups and referrals were:

    a.  Remain on Suicide Watch

    b.  Follow-up

    c.  Jail Contract QMHP Services

<u>**December 17, 2020**</u>

**Second Mental Health Jail Screening and Triage Service**

59.     On December 17, 2020 a second Mental Health Jail Screening and Triage Service was conducted by Defendant Adrianna Moya, QMHPCS and signed at 4:51 PM.

60.     Defendant Moya noted that there had not been a suicide attempt since Dakota tried to hang himself earlier that morning.

61.     Defendant Moya indicated in the Presenting Problems section that Dakota did not want to talk to her but simply wanted to sleep.

62.     Defendant Moya recommended that Dakota remain on suicide watch and a follow up be completed.

### December 29, 2020

### Evaluation and Management Assessment

63.     On December 29, 2020, an Evaluation and Management one month follow up was conducted via telemed by Defendant Minnie Morales, APN, DEA and signed at 9:08 PM.

64.     In the Narrative section it was noted that:

a.   "Mr. Brannen reports depressed mood, feeling helpless, hopeless and unmotivated."

b.   "He reports that he victim in his case was well known in the community and now he feels everyone is against him."

c.   "He feels he has no social support and lack of reasons to live."

d.   He states he is not currently suicidal today, but that about two weeks ago he attempted to hang his self in the jail."

e.   "He states since the suicide attempt that he was moved to a cell alone and is physically cold, lonely and no longer has phone access to call his girlfriend who he feels is his only support system."

f.   "He reports he has not been taking three medications, but instead two- stating he has not been receiving his abilify for some reason."

65.     In the History section it was noted that:

a.   Behavioral/Emotional Symptom: depressed mood

b.   Severity: severe

66.     Mental Status Exam indicated:

    a.  Suicidal Ideation: Ideations without Plan or Intent

67.    In the Practitioners view of identified problems, the following was noted:

    a.  Appetite: worsening

    b.  Impulsive behavior: worsening

    c.  Anxiety: worsening

    d.  Aggression: worsening

    e.  Depression: worsening

    f.  Suicide: worsening

    g.  Legal: worsening

    h.  Family crisis: worsening

68.    The Plan of Care included:

    a.  Increase hydroxyzine to 50mg po TID for anxiety.

    b.  Continue trazodone 100mg po QHS for sleep

    c.  Continue abilify 15mg po QDA Y for mood/aggression.

    d.  F/U 4-6 weeks

69.    It was noted to discuss Dakota's case with a Case Manager.

**<u>January 15, 2021</u>**

**Second Suicide Attempt
By Cutting His Wrists**

70.    On January 15, 2021, Dakota attempted suicide for a second time in the Terry County Jail by cutting his wrists while in a segregation cell, not on suicide watch, and not being adequately monitored.

**<u>January 15, 2021</u>**

**Mental Health Screening and Triage Service**

71.     On January 15, 2021, following his second suicide attempt by cutting his own wrists, a Mental Health Jail Screening and Triage Service assessment was conducted via Tele-Health by Defendant Nichole Faulkner, QMHPCS and Defendant Katye Clark, which was signed at 3:53 PM.

72.     In the Presenting Problems section the following was noted:

    a.   "Dakota was assessed at the Terry County Jail via Tele-Health."

    b.   "Dakota is currently on suicide watch due to him taking razor and cutting both of his wrists."

    c.   "He reports that he did this as an outcry to get help."

    d.   "He states that he has not slept in 4 days due to not getting his medication for 3 days."

    e.   "Dakota stated that everything is falling apart."

    f.   "His girlfriend is in jail for the same thing and he saw her yesterday and he got really sad."

    g.   "Dakota reports that he is on suicide watch and he does not want to be."

    h.   "It has been recommended Dakota remain on suicide watch."

73.     The Suicide Assessment indicated:

    a.   Current attempt self-harm (self injury/non-lethal nature)

74.     The Risk Estimation/Risk Indicators noted were:

    a.   Self-mutilation

    b.   History of abuse

    c.  Hopelessness

75.    The Recommended Interventions, Follow-ups and referrals were:

    a.  Remain on Suicide Watch

### January 19, 2021

### Evaluation and Management

76.    On January 19, 2021, an Evaluation and Management assessment was conducted by Defendant Matthew Faubion, DEA, MD/DO and signed at 9:39 AM.

77.    The Reason for Visit was noted as: Crisis Follow-up

78.    In the Chief Complaint/Narrative, the following was noted:

    a.  Today, he reported that he continues to deal with depressed mood related to his situation.

    b.  He endorsed paranoia ("I feel like they're out to get me", irritability ("if they put me in general population, I'm going to fight"), and auditory hallucinations.

    c.  He stated that he hears voices that are "condescending, and tell me bad things about myself."

    d.  He reported that the voices have told him to hurt himself and were implicated in his hanging attempt in December 2020 as well as the recent wrist cutting on 15 Jan 2021.

    e.  he has stopped taking his Ability 15mg po qAM approximately 2 weeks ago.

    f.  He denied thoughts of wanting to hurt himself at this time, but he acknowledged that the voices instruct him to hurt himself.

    g.  He is no longer on suicide watch, and he does not endorse thoughts of self-harm.

79.    In the History of Present Illness section, it was noted that:

    a.   Behavioral/Emotional Symptom: depressed mood, psychosis, irritability

    b.   Severity: severe

    c.   Quality: deprecating command hallucinations; irritability

    d.   Duration: chronic

80.    In the Mental Status Exam, the following was noted:

    a.   Mood: depressed; irritable

    b.   Thought content: delusions

    c.   Suicidal Ideations: Ideations without Plan or Intent

    d.   Comments: negatively-themed hallucinations that are worse since he stopped taking Abilify 2 weeks ago. **Has fleeting thoughts of suicide** but no intent or plan and he is future-oriented.

81.    In the Practitioner's View of Identified Problems section, the following was noted:

    a.   Impulsive behavior: worsening

    b.   Ability to focus: worsening

    c.   Medication side effects: worsening

    d.   Medication efficacy: worsening

    e.   Anxiety: worsening

    f.   Aggression: worsening

    g.   Psychotic behavior: worsening

    h.   Depression: worsening

    i.   Legal: worsening

    j.   Family Crisis: worsening

82.    The Plan of Care was the following:

    a.   Discontinue Abilify

    b.   Discontinue Trazodone

    c.   Start Clonodine

    d.   Start Zyprexa

83.    Zyprexa is a brand of the drug Olanzapine. According to <u>www.mayoclinic.org</u>[2]: "Olanzapine may cause some people to be agitated, irritable, or display other abnormal behaviors. It may also cause some people to have **suicidal thoughts and tendencies** or to become more depressed."

84.    Accordingly, Dakota was being started on a medications, Zyprexa, which causes suicidal ideations.

85.    Each of the MHMR personnel who evaluated or assessed Dakota following this January 19, 2021 evaluation would have seen in his file by reading his medication list and seeing this evaluation that Dakota was being prescribed Zyprexa as of January 19, 2021.

86.    Each of the MHMR personnel who evaluated or assessed Dakota following this January 19, 2021 evaluation would have known that the side effects of Zyprexa include suicidal ideations by way of their training, licensures, and experience as mental health professionals.

<u>**February 5, 2021**</u>

**Third Suicide Attempt
By Overdose**

87.    On February 5, 2021, Dakota attempted suicide by overdose when he ingested nine Trazodone pills, while in a segregation cell, not on suicide watch, and not being adequately monitored.

---

[2] https://www.mayoclinic.org/drugs-supplements/olanzapine-oral-route/precautions/drg-20071350

<u>**February 5, 2021**</u>

**Mental Health Jail Screening and Triage Service**

88.    Later that day, Defendant Nichole Faulkner, QMHP-CS, and Defendant Gloria Ramirez, MNTR, QMHP, conducted a Tele-Health assessment of Dakota following his latest suicide attempt.

89.    Under Presenting Problems, it was noted that:

    a.  Today Dakota went to court and was indicted on capital murder charges.

    b.  Dakota reported that he was talking to his step dad on the phone and got depressed. His mother has COVID and his aunt passed away.

    c.  He states that all of his charges adding up and family sick I got overwhelmed and depressed.

    d.  He reports that he stopped taking his medication and he has two voices that tells him to stop taking his medication.

    e.  He states the voices are always there but when I get anxious they get louder.

    f.  He does not think his medication is working and would like a doctor appointment.

90.    The Suicide Assessment indicated:

    a.  Dakota attempted suicide by overdose.

91.    The Risk Estimation/Risk Indicators noted were:

    a.  Isolating

    b.  Impulsivity

    c.  Sign of depression

92.    The Recommended interventions, follow-ups and referrals were:

    a.  Remain on Suicide Watch

b.  Follow-up

## February 8, 2021

## Dakota was Removed from Suicide Watch

93.    Only three days after attempting suicide for the third time, after learning of (1) his capital murder indictment, (2) his mother getting COVID, and (3) his aunt passing away, Dakota was taken off suicide watch.

94.    Upon information and belief, after a reasonable opportunity for further investigation or discovery evidentiary support will establish that, the mental health provider from West Texas Centers that removed Dakota from suicide watch did so via Tele-Health as each of the majority of his previous assessments on were conducted via Tele-Health. Fed. R. Civ. P. 11(b)(3).

### Nichole Faulkner

95.    Upon information and belief, after a reasonable opportunity for further investigation or discovery evidentiary support will establish that Defendant Nichole Faulkner was the mental health provider that removed Dakota from suicide watch on February 8, 2021, as she was the mental health provider that recommended he remain on suicide watch following his third suicide attempt on February 5, 2021 and also following his second suicide attempt on January 15, 2021 and continuity of care would dictate that Dakota be seen by the same mental health professionals when possible. Fed. R. Civ. P. 11(b)(3).

96.    When removing Dakota from suicide watch on February 8, 2021, Defendant Faulkner had access to Dakota's file which included each of the assessments and evaluations done on Dakota while he was in the Terry County Jail as they would be part of his mental health file and each one was done by mental health personnel from West Texas Centers where Defendant Faulkner works.

97.     Accordingly, when removing Dakota from suicide watch on February 8, 2021, Defendant Faulkner knew that since being booked into the Terry County Jail on November 5, 2020, Dakota had attempted suicide three separate times by (1) hanging himself with two bedsheets in December 2020 necessitating suicide watch; (2) cutting his wrists on January 15, 2021 necessitating suicide watch; and (3) overdosing on Trazodone on February 5, 2020 which necessitated his current suicide watch.

98.     Access to his file, evaluations, and assessments would also have given Defendant Faulkner the information that on February 5, 2021, Dakota learned that (1) he had been indicted on capital murder charges; (2) his mother had COVID; and (3) his aunt had passed away – which are all triggers which could cause someone to commit suicide and which actually did cause Dakota to overdose on Trazodone three days prior necessitating a trip to the hospital and suicide watch.

99.     Access to his file, evaluations, and assessments would also have given Defendant Faulkner the information that Dakota had been diagnosed with Major Depressive Disorder, which was characterized as severe, and continuously heard voices in his head telling him to injure and kill himself – which he implicated in his previous suicide attempts, and which had not gone away as of February 8, 2021.

100.     Access to his file, evaluations, and assessments would also have given Defendant Faulkner the information that as recently as February 5, 2021, Dakota reported that he stopped taking his medication, he has two voices that tell him to stop taking his medication, and he stated the voices are always there but when I get anxious they get louder.

101.     Access to his file, evaluations, and assessments would also have given Defendant Faulkner the information that as recently as February 5, 2021, Dakota reported that he did not believe his medication was working.

102.    All of these things put Defendant Faulkner on notice that Dakota's suicidal ideations were not improving and he was a risk of harming or killing himself.

103.    As a result of her experience with the Terry County Jail, Defendant Faulkner was aware that by removing Dakota from suicide watch he would be placed into a cell with access to ligatures, tie off points, and less monitoring than if he were in a holding cell on suicide watch.

104.    Despite this information, Defendant Faulkner removed Dakota from suicide watch, knowing he would be placed into a cell with sheets, which were the same ligature he had used to attempt to hang himself in December 2020 in the Terry County Jail, and tie off points.

<u>Gloria Ramirez</u>

105.    Pursuant to Federal Rule of Civil Procedure 8(d), Plaintiff pleads in the alternative that <u>Gloria Ramirez</u> was the mental health provider that removed Dakota from suicide watch on February 8, 2021, as she was the mental health provider that recommended he remain on suicide watch following his third suicide attempt on February 5, 2021 and continuity of care would dictate that Dakota be seen by the same mental health professionals when possible. Fed. R. Civ. P. 8(d).

106.    When removing Dakota from suicide watch on February 8, 2021, Defendant Ramirez had access to Dakota's file which included each of the assessments and evaluations done on Dakota while he was in the Terry County Jail as they would be part of his mental health file and each one was done by mental health personnel from West Texas Centers where Defendant Ramirez works.

107.    Accordingly, when removing Dakota from suicide watch on February 8, 2021, Defendant Ramirez knew that since being booked into the Terry County Jail on November 5, 2020, Dakota had attempted suicide three separate times by (1) hanging himself with two bedsheets in December 2020 necessitating suicide watch; (2) cutting his wrists on January 15, 2021

necessitating suicide watch; and (3) overdosing on Trazodone on February 5, 2020 which necessitated his current suicide watch.

108. Access to his file, evaluations, and assessments would also have given Defendant Ramirez the information that on February 5, 2021, Dakota learned that (1) he had been indicted on capital murder charges; (2) his mother had COVID; and (3) his aunt had passed away – which are all triggers which could cause someone to commit suicide and which actually did cause Dakota to overdose on Trazodone three days prior necessitating a trip to the hospital and suicide watch.

109. Access to his file, evaluations, and assessments would also have given Defendant Ramirez the information that Dakota had been diagnosed with Major Depressive Disorder, which was characterized as severe, and continuously heard voices in his head telling him to injure and kill himself – which he implicated in his previous suicide attempts, and which had not gone away as of February 8, 2021.

110. Access to his file, evaluations, and assessments would also have given Defendant Ramirez the information that as recently as February 5, 2021, Dakota reported that he stopped taking his medication, he has two voices that tell him to stop taking his medication, and he stated the voices are always there but when I get anxious they get louder.

111. Access to his file, evaluations, and assessments would also have given Defendant Ramirez the information that as recently as February 5, 2021, Dakota reported that he did not believe his medication was working.

112. All of these things put Defendant Ramirez on notice that Dakota's suicidal ideations were not improving and he was a risk of harming or killing himself.

113.    As a result of her experience with the Terry County Jail, Defendant Ramirez was aware that by removing Dakota from suicide watch he would be placed into a cell with access to ligatures, tie off points, and less monitoring than if he were in a holding cell on suicide watch.

114.    Despite this information, Defendant Ramirez removed Dakota from suicide watch, knowing he would be placed into a cell with sheets, which were the same ligature he had used to attempt to hang himself in December 2020 in the Terry County Jail, and tie off points.

Minnie Morales

115.    Pursuant to Federal Rule of Civil Procedure 8(d), Plaintiff pleads in the alternative that Minnie Morales was the mental health provider that removed Dakota from suicide watch via Tele-Health assessment on February 8, 2021, as she provided his mental health assessments on November 24, 2020 and December 29, 2020 and continuity of care would dictate that Dakota be seen by the same mental health professionals when possible. Fed. R. Civ. P. 8(d).

116.    When removing Dakota from suicide watch on February 8, 2021, Defendant Morales had access to Dakota's file which included each of the assessments and evaluations done on Dakota while he was in the Terry County Jail as they would be part of his mental health file and each one was done by mental health personnel from West Texas Centers where Defendant Morales works.

117.    Accordingly, when removing Dakota from suicide watch on February 8, 2021, Defendant Morales knew that since being booked into the Terry County Jail on November 5, 2020, Dakota had attempted suicide three separate times by (1) hanging himself with two bedsheets in December 2020 necessitating suicide watch; (2) cutting his wrists on January 15, 2021 necessitating suicide watch; and (3) overdosing on Trazodone on February 5, 2020 which necessitated his current suicide watch.

118.    Access to his file, evaluations, and assessments would also have given Defendant Morales the information that on February 5, 2021, Dakota learned that (1) he had been indicted on capital murder charges; (2) his mother had COVID; and (3) his aunt had passed away – which are all triggers which could cause someone to commit suicide and which actually did cause Dakota to overdose on Trazodone three days prior necessitating a trip to the hospital and suicide watch.

119.    Access to his file, evaluations, and assessments would also have given Defendant Morales the information that Dakota had been diagnosed with Major Depressive Disorder, which was characterized as severe, and continuously heard voices in his head telling him to injure and kill himself – which he implicated in his previous suicide attempts, and which had not gone away as of February 8, 2021.

120.    Access to his file, evaluations, and assessments would also have given Defendant Morales the information that as recently as February 5, 2021, Dakota reported that he stopped taking his medication, he has two voices that tell him to stop taking his medication, and he stated the voices are always there but when I get anxious they get louder.

121.    Access to his file, evaluations, and assessments would also have given Defendant Morales the information that as recently as February 5, 2021, Dakota reported that he did not believe his medication was working.

122.    All of these things put Defendant Morales on notice that Dakota's suicidal ideations were not improving and he was a risk of harming or killing himself.

123.    As a result of her experience with the Terry County Jail, Defendant Morales was aware that by removing Dakota from suicide watch he would be placed into a cell with access to ligatures, tie off points, and less monitoring than if he were in a holding cell on suicide watch.

124.   Despite this information, Defendant Morales removed Dakota from suicide watch, knowing he would be placed into a cell with sheets, which were the same ligature he had used to attempt to hang himself in December 2020 in the Terry County Jail, and tie off points.

### Annie McElfresh

1.   Pursuant to Federal Rule of Civil Procedure 8(d), Plaintiff pleads in the alternative that Annie McElfresh was the mental health provider that removed Dakota from suicide watch on February 8, 2021, as she provided his mental health assessment on December 27, 2020 and continuity of care would dictate that Dakota be seen by the same mental health professionals when possible. Fed. R. Civ. P. 8(d).

2.   When removing Dakota from suicide watch on February 8, 2021, Defendant McElfresh had access to Dakota's file which included each of the assessments and evaluations done on Dakota while he was in the Terry County Jail as they would be part of his mental health file and each one was done by mental health personnel from West Texas Centers where Defendant McElfresh works.

3.   Accordingly, when removing Dakota from suicide watch on February 8, 2021, Defendant McElfresh knew that since being booked into the Terry County Jail on November 5, 2020, Dakota had attempted suicide three separate times by (1) hanging himself with two bedsheets in December 2020 necessitating suicide watch; (2) cutting his wrists on January 15, 2021 necessitating suicide watch; and (3) overdosing on Trazodone on February 5, 2020 which necessitated his current suicide watch.

4.   Access to his file, evaluations, and assessments would also have given Defendant McElfresh the information that on February 5, 2021, Dakota learned that (1) he had been indicted on capital murder charges; (2) his mother had COVID; and (3) his aunt had passed away – which

are all triggers which could cause someone to commit suicide and which actually did cause Dakota to overdose on Trazodone three days prior necessitating a trip to the hospital and suicide watch.

5.    Access to his file, evaluations, and assessments would also have given Defendant McElfresh the information that Dakota had been diagnosed with Major Depressive Disorder, which was characterized as severe, and continuously heard voices in his head telling him to injure and kill himself – which he implicated in his previous suicide attempts, and which had not gone away as of February 8, 2021.

6.    Access to his file, evaluations, and assessments would also have given Defendant McElfresh the information that as recently as February 5, 2021, Dakota reported that he stopped taking his medication, he has two voices that tell him to stop taking his medication, and he stated the voices are always there but when I get anxious they get louder.

7.    Access to his file, evaluations, and assessments would also have given Defendant McElfresh the information that as recently as February 5, 2021, Dakota reported that he did not believe his medication was working.

8.    All of these things put Defendant McElfresh on notice that Dakota's suicidal ideations were not improving and he was a risk of harming or killing himself.

9.    As a result of her experience with the Terry County Jail, Defendant McElfresh was aware that by removing Dakota from suicide watch he would be placed into a cell with access to ligatures, tie off points, and less monitoring than if he were in a holding cell on suicide watch.

10.    Despite this information, Defendant McElfresh removed Dakota from suicide watch, knowing he would be placed into a cell with sheets, which were the same ligature he had used to attempt to hang himself in December 2020 in the Terry County Jail, and tie off points.

<u>Adrianna Moya</u>

11.     Pursuant to Federal Rule of Civil Procedure 8(d), Plaintiff pleads in the alternative that <u>Adrianna Moya</u> was the mental health provider that removed Dakota from suicide watch on February 8, 2021, as she provided his mental health assessment on December 17, 2020 and continuity of care would dictate that Dakota be seen by the same mental health professionals when possible. Fed. R. Civ. P. 8(d).

12.     When removing Dakota from suicide watch on February 8, 2021, Defendant Moya had access to Dakota's file which included each of the assessments and evaluations done on Dakota while he was in the Terry County Jail as they would be part of his mental health file and each one was done by mental health personnel from West Texas Centers where Defendant Moya works.

13.     Accordingly, when removing Dakota from suicide watch on February 8, 2021, Defendant Moya knew that since being booked into the Terry County Jail on November 5, 2020, Dakota had attempted suicide three separate times by (1) hanging himself with two bedsheets in December 2020 necessitating suicide watch; (2) cutting his wrists on January 15, 2021 necessitating suicide watch; and (3) overdosing on Trazodone on February 5, 2020 which necessitated his current suicide watch.

14.     Access to his file, evaluations, and assessments would also have given Defendant Moya the information that on February 5, 2021, Dakota learned that (1) he had been indicted on capital murder charges; (2) his mother had COVID; and (3) his aunt had passed away – which are all triggers which could cause someone to commit suicide and which actually did cause Dakota to overdose on Trazodone three days prior necessitating a trip to the hospital and suicide watch.

15.     Access to his file, evaluations, and assessments would also have given Defendant Moya the information that Dakota had been diagnosed with Major Depressive Disorder, which

was characterized as severe, and continuously heard voices in his head telling him to injure and kill himself – which he implicated in his previous suicide attempts, and which had not gone away as of February 8, 2021.

16. Access to his file, evaluations, and assessments would also have given Defendant Moya the information that as recently as February 5, 2021, Dakota reported that he stopped taking his medication, he has two voices that tell him to stop taking his medication, and he stated the voices are always there but when I get anxious they get louder.

17. Access to his file, evaluations, and assessments would also have given Defendant Moya the information that as recently as February 5, 2021, Dakota reported that he did not believe his medication was working.

18. All of these things put Defendant Moya on notice that Dakota's suicidal ideations were not improving and he was a risk of harming or killing himself.

19. As a result of her experience with the Terry County Jail, Defendant Moya was aware that by removing Dakota from suicide watch he would be placed into a cell with access to ligatures, tie off points, and less monitoring than if he were in a holding cell on suicide watch.

20. Despite this information, Defendant Moya removed Dakota from suicide watch, knowing he would be placed into a cell with sheets, which were the same ligature he had used to attempt to hang himself in December 2020 in the Terry County Jail, and tie off points.

### Anna Collazo

21. Pursuant to Federal Rule of Civil Procedure 8(d), Plaintiff pleads in the alternative that Anna Collazo was the mental health provider that removed Dakota from suicide watch on February 8, 2021, as she provided his mental health assessment on December 17, 2020 and

continuity of care would dictate that Dakota be seen by the same mental health professionals when possible. Fed. R. Civ. P. 8(d).

22.     When removing Dakota from suicide watch on February 8, 2021, Defendant Collazo had access to Dakota's file which included each of the assessments and evaluations done on Dakota while he was in the Terry County Jail as they would be part of his mental health file and each one was done by mental health personnel from West Texas Centers where Defendant Collazo works.

23.     Accordingly, when removing Dakota from suicide watch on February 8, 2021, Defendant Collazo knew that since being booked into the Terry County Jail on November 5, 2020, Dakota had attempted suicide three separate times by (1) hanging himself with two bedsheets in December 2020 necessitating suicide watch; (2) cutting his wrists on January 15, 2021 necessitating suicide watch; and (3) overdosing on Trazodone on February 5, 2020 which necessitated his current suicide watch.

24.     Access to his file, evaluations, and assessments would also have given Defendant Collazo the information that on February 5, 2021, Dakota learned that (1) he had been indicted on capital murder charges; (2) his mother had COVID; and (3) his aunt had passed away – which are all triggers which could cause someone to commit suicide and which actually did cause Dakota to overdose on Trazodone three days prior necessitating a trip to the hospital and suicide watch.

25.     Access to his file, evaluations, and assessments would also have given Defendant Collazo the information that Dakota had been diagnosed with Major Depressive Disorder, which was characterized as severe, and continuously heard voices in his head telling him to injure and kill himself – which he implicated in his previous suicide attempts, and which had not gone away as of February 8, 2021.

26.     Access to his file, evaluations, and assessments would also have given Defendant Collazo the information that as recently as February 5, 2021, Dakota reported that he stopped taking his medication, he has two voices that tell him to stop taking his medication, and he stated the voices are always there but when I get anxious they get louder.

27.     Access to his file, evaluations, and assessments would also have given Defendant Collazo the information that as recently as February 5, 2021, Dakota reported that he did not believe his medication was working.

28.     All of these things put Defendant Collazo on notice that Dakota's suicidal ideations were not improving and he was a risk of harming or killing himself.

29.     As a result of her experience with the Terry County Jail, Defendant Collazo was aware that by removing Dakota from suicide watch he would be placed into a cell with access to ligatures, tie off points, and less monitoring than if he were in a holding cell on suicide watch.

30.     Despite this information, Defendant Collazo removed Dakota from suicide watch, knowing he would be placed into a cell with sheets, which were the same ligature he had used to attempt to hang himself in December 2020 in the Terry County Jail, and tie off points.

<u>Katye Clark</u>

31.     Pursuant to Federal Rule of Civil Procedure 8(d), Plaintiff pleads in the alternative that <u>Katye Clark</u> was the mental health provider that removed Dakota from suicide watch on February 8, 2021, as she provided his mental health assessment on January 15, 2021 and continuity of care would dictate that Dakota be seen by the same mental health professionals when possible. Fed. R. Civ. P. 8(d).

32.     When removing Dakota from suicide watch on February 8, 2021, Defendant Clark had access to Dakota's file which included each of the assessments and evaluations done on Dakota

33

while he was in the Terry County Jail as they would be part of his mental health file and each one was done by mental health personnel from West Texas Centers where Defendant Clark works.

33.     Accordingly, when removing Dakota from suicide watch on February 8, 2021, Defendant Clark knew that since being booked into the Terry County Jail on November 5, 2020, Dakota had attempted suicide three separate times by (1) hanging himself with two bedsheets in December 2020 necessitating suicide watch; (2) cutting his wrists on January 15, 2021 necessitating suicide watch; and (3) overdosing on Trazodone on February 5, 2020 which necessitated his current suicide watch.

34.     Access to his file, evaluations, and assessments would also have given Defendant Clark the information that on February 5, 2021, Dakota learned that (1) he had been indicted on capital murder charges; (2) his mother had COVID; and (3) his aunt had passed away – which are all triggers which could cause someone to commit suicide and which actually did cause Dakota to overdose on Trazodone three days prior necessitating a trip to the hospital and suicide watch.

35.     Access to his file, evaluations, and assessments would also have given Defendant Clark the information that Dakota had been diagnosed with Major Depressive Disorder, which was characterized as severe, and continuously heard voices in his head telling him to injure and kill himself – which he implicated in his previous suicide attempts, and which had not gone away as of February 8, 2021.

36.     Access to his file, evaluations, and assessments would also have given Defendant Clark the information that as recently as February 5, 2021, Dakota reported that he stopped taking his medication, he has two voices that tell him to stop taking his medication, and he stated the voices are always there but when I get anxious they get louder.

37.    Access to his file, evaluations, and assessments would also have given Defendant Clark the information that as recently as February 5, 2021, Dakota reported that he did not believe his medication was working.

38.    All of these things put Defendant Clark on notice that Dakota's suicidal ideations were not improving and he was a risk of harming or killing himself.

39.    As a result of her experience with the Terry County Jail, Defendant Clark was aware that by removing Dakota from suicide watch he would be placed into a cell with access to ligatures, tie off points, and less monitoring than if he were in a holding cell on suicide watch.

40.    Despite this information, Defendant Clark removed Dakota from suicide watch, knowing he would be placed into a cell with sheets, which were the same ligature he had used to attempt to hang himself in December 2020 in the Terry County Jail, and tie off points.

Matthew Faubion

41.    Pursuant to Federal Rule of Civil Procedure 8(d), Plaintiff pleads in the alternative that Matthew Faubion was the mental health provider that removed Dakota from suicide watch on February 8, 2021, as he provided his mental health evaluation on January 19, 2021 and continuity of care would dictate that Dakota be seen by the same mental health professionals when possible. Fed. R. Civ. P. 8(d).

42.    When removing Dakota from suicide watch on February 8, 2021, Defendant Faubion had access to Dakota's file which included each of the assessments and evaluations done on Dakota while he was in the Terry County Jail as they would be part of his mental health file and each one was done by mental health personnel from West Texas Centers where Defendant Faubion works.

43.    Accordingly, when removing Dakota from suicide watch on February 8, 2021, Defendant Faubion knew that since being booked into the Terry County Jail on November 5, 2020, Dakota had attempted suicide three separate times by (1) hanging himself with two bedsheets in December 2020 necessitating suicide watch; (2) cutting his wrists on January 15, 2021 necessitating suicide watch; and (3) overdosing on Trazodone on February 5, 2020 which necessitated his current suicide watch.

44.    Access to his file, evaluations, and assessments would also have given Defendant Faubion the information that on February 5, 2021, Dakota learned that (1) he had been indicted on capital murder charges; (2) his mother had COVID; and (3) his aunt had passed away – which are all triggers which could cause someone to commit suicide and which actually did cause Dakota to overdose on Trazodone three days prior necessitating a trip to the hospital and suicide watch.

45.    Access to his file, evaluations, and assessments would also have given Defendant Faubion the information that Dakota had been diagnosed with Major Depressive Disorder, which was characterized as severe, and continuously heard voices in his head telling him to injure and kill himself – which he implicated in his previous suicide attempts, and which had not gone away as of February 8, 2021.

46.    Access to his file, evaluations, and assessments would also have given Defendant Faubion the information that as recently as February 5, 2021, Dakota reported that he stopped taking his medication, he has two voices that tell him to stop taking his medication, and he stated the voices are always there but when I get anxious they get louder.

47.    Access to his file, evaluations, and assessments would also have given Defendant Faubion the information that as recently as February 5, 2021, Dakota reported that he did not believe his medication was working.

48.     All of these things put Defendant Faubion on notice that Dakota's suicidal ideations were not improving and he was a risk of harming or killing himself.

49.     As a result of her experience with the Terry County Jail, Defendant Faubion was aware that by removing Dakota from suicide watch he would be placed into a cell with access to ligatures, tie off points, and less monitoring than if he were in a holding cell on suicide watch.

50.     Despite this information, Defendant Faubion removed Dakota from suicide watch, knowing he would be placed into a cell with sheets, which were the same ligature he had used to attempt to hang himself in December 2020 in the Terry County Jail, and tie off points.

<u>**February 26, 2021**</u>

**Dakota Committed Suicide
By Hanging**

51.     On February 26, 2021, Dakota successfully committed suicide by hanging himself using bedsheets he tied together into a makeshift rope. He tied the end of his bedsheet rope to his bed, threw the rope over the partial wall separating his bed from his shower, tied the other end of the rope into a noose, and hung himself suspended from the partial wall in the shower area of his cell.

52.     This process took Dakota nearly 56 minutes. For 56 minutes, Dakota was tying bedsheets together, throwing the sheets over the partial wall to test the height and strength of the rope, and adjusting the noose.

53.     The entirety of this lengthy process was on camera in his segregation cell.

54.     Had anyone been monitoring the camera videos in the eleven segregation cells – many of which were empty and would not have required monitoring – Dakota would have been seen making his noose and testing his gallows. He would have been saved.

55.     Unfortunately, the pattern and practice at the Terry County Jail, approved and repeatedly ratified by Sheriff Click was not to monitor the video feeds of the segregation cells where inmates at elevated risks were housed.

56.     Another way that Dakota could have been stopped is if jailers made their rounds and made visible contact with Dakota during the hour long process while he built and tested his noose and gallows.

57.     However, like was the pattern and practice at the Terry County Jail, documented by the Texas Commission on Jail Standards dating back to March of 2019, the jailers in this case did not do checks on Dakota, which would have allowed them to see what he was doing and prevent him from committing suicide.

58.     The following is a timestamp description of what the video in Dakota's cell captured – which is what any jailer would have seen had they monitored his camera feed throughout this hour-long process.

59.     At 10:58:15, Dakota was working on tying his sheets into a rope.

60.     At 10:59:23, Dakota wrapped the sheets around his neck while making a noose.

61.     At 11:00:15, Dakota continued tying the blanket and sheet together.

62.     At 11:00:45, Dakota piled the knot and "sheet rope" up with his blanket on the bed.

63.     At 11:00:52, Defendant Peters placed a food tray in the food port of Dakota's cell door. Dakota did not move the tray at any point – and his was the only tray that was not touched out of the segregation cells 1 through 7.

64.     When Defendant Peters placed the food tray in the food port of Dakota's cell door, Defendant Peters did not look into the cell or even attempt to look into the cell or make contact with Dakota.

65.     At 11:01:05, Dakota returned to working on the noose.

66.     At 11:01:38, Dakota threw the noose over the wall separating his bed from the shower. Dakota began pulling on it to test its strength.

67.     At 11:02:05, Dakota tried out different ways of tying the noose to the bed.

68.     At 11:03:25, Dakota again tested the strength of noose on the shower side.

69.     At 11:03:49, Dakota began testing the height of the noose and was putting it under his chin.

70.     At 11:04:15, Dakota went back to working on securing the noose to the bed again. Dakota continued to work on the noose on the shower side.

71.     At 11:09:15, Dakota walked away from the noose as it was left on his bed.

72.     At 11:09:35, Dakota looked out his cell door window.

73.     From 11:09:36-11:13:58, Dakota was at the phone in his cell.

74.     At 11:13:58, Dakota threw the noose over the partial wall and tried it around his neck in shower area again where he continued working on the noose.

75.     At 11:15:27, Dakota covered up the noose with the sheet on his bed.

76.     At 11:16:35 Dakota used the restroom.

77.     From 11:16:50-11:17:30, Dakota was back on the phone.

78.     From 11:17:40-11:23:28, Dakota was standing at his door looking through the window.

79.     At 11:23:19, Defendant Peters took Dakota's food tray away and closed the food port hatch.

80.     At 11:23:29, Dakota went back to working on the noose.

81.     At 11:26:10, Dakota again threw the noose over the wall and tested its strength.

82.    At 11:27:48, Defendant Jacquez can be seen walking by Dakota's cell through the window and Dakota threw the noose back over wall and onto the bed.

83.    Had Defendant Jacquez looked into Dakota's window he would have seen Dakota working on the noose.

84.    At 11:27:52, Dakota was at the door looking through the window.

85.    At 11:27:58, Dakota went back to working on the noose.

86.    From 11:28:26-11:31:01, Dakota was standing at the door looking out of the window.

87.    At 11:31:04, Dakota went back to working on the noose.

88.    At 11:31:16, Dakota go back on the phone.

89.    At 11:32:40, Dakota went back to working with the noose on the bed.

90.    At 11:32:50, Dakota threw the noose over the wall and worked on the noose.

91.    From 11:33:05-11:36:40, Dakota was pulling down on bed to work on it and tying the noose to the bed frame.

92.    At 11:36:40, Dakota threw the noose back over the wall to work on it and put the noose around his neck.

93.    At 11:37:01, Dakota sat on the bed to work on the noose.

94.    From 11:38:52-11:41:12, Dakota worked on the noose while it was draped over the wall.

95.    At 11:41:13, Dakota sat on the bed to work on the noose.

96.    From 11:42:35-11:44:04, Dakota was on the phone with the noose visibly laying on the bed.

97.    At 11:44:08, Dakota was standing at the door looking out of the window.

98.    At 11:44:17, Dakota went to the bed to work on noose and threw it over the wall to practice hanging himself with the noose.

99.    At 11:49:18, Dakota could be seen committing suicide by hanging using the noose he had been working on for the past hour thrown over the wall as he had done numerous times.

### Defendant Peters Fabricated Cell Checks
### That Would Have Saved Dakota If They Actually Occurred

100.    Defendant Peters marked on the cell Check Sheet that he checked Cells S1-S7 at 9:20 AM on February 26, 2021, that everyone was "OK", and put his initials indicating he was the one that did the check.

101.    However, no check was done on Dakota anywhere near this time.

102.    Defendant Peters marked on the cell check list that he checked Cells S1-S7 at 9:45 AM on February 26, 2021, that everyone was "OK", and put his initials indicating he was the one that did the check.

103.    However, no check was done on Dakota anywhere near this time.

104.    Defendant Jacquez walked by Dakota's cell at 9:55 AM but did not even attempt to look in the cell or even at the direction of Dakota's door – this was not a cell check and can't even be argued that it was one.

105.    Defendant Peters marked on the cell check list that he checked Cells S1-S7 at 10:05 AM on February 26, 2021, that everyone was "OK", and put his initials indicating he was the one that did the check.

106.    However, no check was done on Dakota anywhere near this time.

107.    Defendant Jacquez walked by Dakota's cell at 10:01 AM but did not even attempt to look in the cell or even at the direction of Dakota's door – this was not a cell check and can't even be argued that it was one.

108.    Defendant Peters marked on the cell check list that he checked Cells S1-S7 at 10:20 AM on February 26, 2021, that everyone was "OK", and put his initials indicating he was the one that did the check.

109.    However, no check was done on Dakota anywhere near this time.

110.    Defendant Jacquez opened the food port hatch on Dakota's cell door at 10:18 AM but did not even attempt to look in the cell window or in the hatch or see what was going on inside the cell – this was not a cell check and can't even be argued that it was one.

111.    Defendant Peters marked on the cell check list that he checked Cells S1-S7 at 10:40 on February 26, 2021, that everyone was "OK", and put his initials indicating he was the one that did the check.

112.    However, no check was done on Dakota anywhere near this time.

113.    Defendant Jacquez filled a mug and put it on the food port hatch on Dakota's cell door at 10:33 AM but did not even attempt to look in the cell window or in the hatch or see what was going on inside the cell – this was not a cell check and can't even be argued that it was one.

114.    Defendant Peters marked on the cell check list that he checked Cells S1-S7 at 11:00 on February 26, 2021, that everyone was "OK", and put his initials indicating he was the one that did the check.

115.    Defendant Peters dropped a food tray on the food port hatch on Dakota's cell door at 11:00 AM but did not even attempt to look in the cell window or in the hatch or see what was going on inside the cell – this was not a cell check and can't even be argued that it was one.

116.    Defendant Peters marked on the cell check list that he checked Cells S1-S7 at 11:20 on February 26, 2021, that everyone was "OK", and put his initials indicating he was the one that did the check.

117.    Defendant Peters picked up the food tray that had not been touched by Dakota at 11:23 AM and actually saw Dakota standing at the door. This is the first time in hours that any jailer has laid eyes on Dakota, despite the checks that Defendant Peters has been marking on the Check Sheet.

118.    Defendant Peters marked on the cell check list that he checked Cells S1-S7 at 11:40 AM on February 26, 2021, that everyone was "OK", and put his initials indicating he was the one that did the check.

119.    However, no check was done on Dakota anywhere near this time.

120.    Everything was not "OK." To the contrary, Dakota was preparing to hang himself in his cell on a camera that wasn't being monitored and behind a window in a door that wasn't being looked through.

121.    Had Defendant Peters or Defendant Jacquez actually checked on Dakota at or near 11:40 AM, they would have seen him preparing to hang himself.

122.    Below is a screenshot from the video of Dakota's cell at the 11:40 AM mark.



123.    Had Defendant Peters of Defendant Jacquez looked into the cell at or near the 11:40 AM mark they would have seen the bedsheet rope thrown over the wall and seen that Dakota was in the shower area. This would have allowed them to stop Dakota from hanging himself and get him the help he desperately needed.

124.    From 11:33 to 11:41, Dakota was working on the noose. Had Defendant Peters or Defendant Jacquez looked into the cell during that period of time they would have seen him doing so and could have stopped him.

125.    Instead, no check was done, and Defendant Peters fabricated a check on the Check Sheet.

126.    Defendant Peters marked on the cell check list that he checked Cells S1-S7 at 12:00 PM on February 26, 2021, that everyone was "OK", and put his initials indicating he was the one that did the check.

127.    However, no check was done on Dakota anywhere near this time.

128.    Dakota began to hang himself around 11:49 AM. Had Defendant Peters or Defendant Jacquez actually looked into the cell at or near 12:00 PM there is a chance they could have cut him down and saved his life.

129.    Instead, no check was done, and Defendant Peters fabricated the check on the Check Sheet.

130.    Everything was not "OK." To the contrary, Dakota was hanging in his cell on a camera that wasn't being monitored and behind a window in a door that wasn't being looked through.

131.    Defendant Peters marked on the cell check list that he checked Cells S1-S7 at 12:20 PM on February 26, 2021, that everyone was "OK", and put his initials indicating he was the one that did the check.

132.    Everything was not OK. To the contrary, Dakota was hanging in his cell on a camera that wasn't being monitored and behind a window in a door that wasn't being looked through.

133.    At 12:23 PM, Defendant Jacquez walked by Dakota's cell, but once again never even attempted to look inside the cell. If he had, he would have seen that Dakota was hanging in his cell – as he had been for the last thirty-four minutes.

134.    Dakota was not found until 12:44 PM when Defendant Jacquez went to Dakota's cell for an attorney visit.

135.    To be clear, no cell check was being done, but Dakota's attorney had come to see him at the jail and that is the only reason why Dakota was found hanging in his cell.

136.    Dakota was hanging in his cell from 11:49 until 12:44, for a total of 55 minute before being found.

137.    This was not simply a case of Defendant Peters negligently failing to check on Dakota and not marking down checks because they didn't happen.

138.    Defendant Peters knew he was supposed to check on Dakota and fabricated those checks on the Check Sheet despite knowing that the checks did not occur – this was deliberate indifference to Dakota's health and safety.

139.    Defendant Peters knew that Dakota was at an elevated risk of harming himself as Defendant Peters monitored Dakota while he was on suicide watch on January 15, 2021 and January 16, 2021 following his suicide attempt by cutting his wrists, as is shown by the notations

on the Special Observation Log where Defendant Peters initialed making thirty-three separate observations of Dakota while he was on suicide watch. Additionally, Defendant Peters knew that Dakota was in a segregation cell.

140.    Furthermore, Dakota had been in the Terry County jail since November 5, 2020 and had either been in segregation or a suicide watch holding cell the entire time as a result of his severe mental health issues which caused him to attempt suicide three times in the jail prior to his February 26, 2021 suicide. Upon information and belief, discovery will reveal evidence that supports Defendant Peters was aware of Dakota's mental health issues and his previous suicide attempts as a result of the amount of time Dakota had been in the jail, the serious nature of his incidents, and Chapter 273.5 of the Terry County Jail written Policy, which states, "Information regarding mentally disabled or suicidal inmates will be passed on from the jailer on duty to the oncoming jailer by verbal communication and by written reports. Notations of a mentally disabled or potentially suicidal inmate will be made in the Jail Pass On notebook by the Sergeant or Jailer on duty. If an incident occurs, the jailer on duty will complete an incident report. All information will be passed on to the oncoming jailer." This policy would have resulted in Defendant Peters learning about Dakota's mental health issues and his suicide attempts.

141.    Defendant Jacquez knew that Dakota was at an elevated risk of harming himself as Defendant Jacquez responded to Dakota's cell on January 15, 2021 when Dakota attempted suicide by cutting his wrists where he was then placed on suicide watch. Defendant Jacquez then monitored Dakota while he was on suicide watch on January 16, 2021, as is shown by the notations on the Special Observation Log where Defendant Jacquez initialed making three separate observations of Dakota while he was on suicide watch. Additionally, Defendant Jacquez knew that Dakota was in a segregation cell.

142.    Furthermore, Dakota had been in the Terry County jail since November 5, 2020 and had either been in segregation or a suicide watch holding cell the entire time as a result of his severe mental health issues which caused him to attempt suicide three times in the jail prior to his February 26, 2021 suicide. Upon information and belief, discovery will reveal evidence that supports Defendant Jacquez was aware of Dakota's mental health issues and his previous suicide attempts as a result of the amount of time Dakota had been in the jail, the serious nature of his incidents, and Chapter 273.5 of the Terry County Jail written Policy, which states, "Information regarding mentally disabled or suicidal inmates will be passed on from the jailer on duty to the oncoming jailer by verbal communication and by written reports. Notations of a mentally disabled or potentially suicidal inmate will be made in the Jail Pass On notebook by the Sergeant or Jailer on duty. If an incident occurs, the jailer on duty will complete an incident report. All information will be passed on to the oncoming jailer." This policy would have resulted in Defendant Jacquez learning about Dakota's mental health issues and his suicide attempts.

143.    Upon information and belief, discovery into evidence in the possession of Defendants will result in information and evidence supporting Defendant Peters and Jacquez were aware of Rodney Howard's suicide in the Terry County Jail on September 12, 2019 in a segregation cell by hanging himself using the partial wall in his cell as the gallows, following numerous suicide attempts in the Terry County Jail. This information would have been provided to Terry County Jailers during trainings to prevent the same issue that resulted in Rodney Howard's death and Defendant Jacquez was employed as a jailer at the Terry County Jail at the time that Rodney Howard committed suicide. Thus, Defendant Peters and Defendant Jacquez were aware that inmates who attempted suicide multiple times in the Terry County Jail and were housed in a segregation cell had an opportunity to do so again using the partition wall as his gallows.

144.    Despite all of this information, Defendant Peters and Defendant Jacquez intentionally refused to check on Dakota, going as far as walking by his cell or opening his food port hatch and not even attempting to look inside of the cell.

145.    Despite all of this information, Defendant Peters lied on his cell Check Sheet by stating checks were made on Dakota that video evidence proves did not happen.

146.    Defendant Peters lied on his cell Check Sheet because he knew that he needed to check on Dakota.

147.    Thus, this is not simply negligence, but rises to deliberate indifference to Dakota's health and safety by refusing to check on him knowing he was a risk to his own health and safety due to everything that had happened with Dakota in the jail to date.

148.    A contributing factor to Defendant Peters and Defendant Jacquez not monitoring and checking on Dakota were the policies and practices in the Terry County Jail of inadequately monitoring inmates at an elevated risk of harm due to understaffing and requiring the jailers to complete other duties which prevented them from adequately monitoring inmates such as Dakota.

## March 4, 2021

### Texas Commission on Jail Standards Inspection Report

149.    Unsurprisingly – due to the clear practice of failing to monitor inmates in the Terry County Jail – on March 4, 2021 – only a week after Dakota committed suicide due to the Terry County Jail's practice of failing to monitor at risk inmates, the Texas Commission on Jail Standards issued an Inspection Report finding that it was determined that on numerous occasions Terry County staff exceeded the 30-minute requirement to observe inmates known to be assaultive, potentially suicidal, mentally ill, or who have demonstrated bizarre behavior.

**March 8, 2021**

**Conversation Between Casondra Warren and Sheriff Timothy Click**

150.    Dakota Brannen's biological mother, Plaintiff Casondra Warren, went to the Terry County Jail on the morning of March 8, 2021and met with Sheriff Click. Sheriff Click showed her the live video feed from the cell where Dakota had died, which was empty at the time he showed her. Sheriff Click apologized and told her Dakota's death was his fault. Sheriff Click explained that they are understaffed and there was one person in the picket to watch 96 cameras, pop doors, and answer phones. Plaintiff Warren said to Sheriff Click that with the time they have on camera of Dakota preparing to kill himself they should have noticed it at some point. Sheriff Click agreed and again said that it was his fault.

151.    These statements from Sheriff Click further support the unconstitutional policies and practices at the Terry County jail to understaff the jail a

**Terry County has a Pattern and Practice of Showing
Deliberate Indifference Toward Inmates with Increased Risk**

152.    Discovery into information within the knowledge of the County will show that there are more instances of deliberate indifference leading to inmates having the opportunity to attempt suicide in the custody of the Terry County Jail due to a lack of adequate monitoring.

153.    According to a sworn affidavit by Dominque Dominguez on October 16, 2022 as part of the lawsuit filed as a result of the death of Rodney Howard in the Terry County Jail, the Terry County jailer responsible for working in the control room is, responsible for monitoring approximately 93 cameras throughout the jail, for opening/closing doors, for answering intercom calls from the inmates in the jail, assisting with booking in new inmates and completing booking paperwork, answering the jail phone, answering the emergency 911 line, and for maintaining paperwork and logs of the issues that occurred and arose during the shift.

154.    Additionally, Dominique Dominguez explained in the October 16, 2022 affidavit that as the jailer in the control room I could not leave the control room, so when things were needed in the jail it was my job to task the jailers in the jail with carrying out those tasks or dealing with inmate requests.

155.    Thus, the Terry County Jail's policy amounts to a practice of not monitoring the video feeds in cells while also knowing that adequate face to face monitoring is not being done due to the jail being understaffed and each jailer being required to perform too many duties to allow them to adequately monitor inmates.

156.    These policies and practices are how Dakota could fabricate a noose and test its functionality for almost an hour in his cell without anyone seeing him or stopping him from committing suicide.

157.    These policies and practices are also how Dakota could hang himself at 11:49 AM and not be found until over an hour later at 12:44 PM.

**Rodney Howard**

158.    On September 12, 2019, Rodney Howard, an inmate in the Terry County Jail, died by suicide when he hung himself inside of segregation cell following multiple other attempted suicides inside of the Terry County Jail – exactly like the facts of this case.

159.    Just as Dakota was not on suicide watch following his multiple suicide attempts, Rodney Howard was also not on suicide watch following his multiple suicide attempts.

160.    Just as the camera in Dakota's cell was not monitored allowing Dakota time to tie up the ligature he used to hang himself and then successfully do so without being stopped or saved, the camera in Rodney Howard's cell was not monitored allowing Rodney Howard to tie up the ligature he used to hang himself and then successfully do so without be stopped or saved.

161.    Rodney Howard's incident demonstrates that there are other instances of deliberate indifference toward inmates with increased risk leading to these inmates having the opportunity to attempt suicide in the custody of the Terry County Jail which will only be uncovered through discovery into information within the knowledge of the County.

162.    Upon information and belief, evidentiary support will be found after a reasonable opportunity for further investigation and discovery to show other instances of inmates known to the Terry County Jail staff of being a suicide risk not being housed on suicide watch, and instead being housed in cells with ligatures and tie off points, which were not being monitored, and who were given access to ligatures such as mop strings and bedsheets without supervision.

**Sheriff Click Approved and Ratified the Policies and Practices at Issue in this Case**

163.    Sheriff Click was aware of the patterns and practices at the Terry County Jail of understaffing the jail, requiring the understaffed employees to complete far too many tasks than would allow them to adequately monitor inmates, and then not monitoring inmates at elevated risk, and then Sheriff Click promulgated, adopted, approved, and/or ratified these policies and practices knowing the likely result was constitutional violations like what occurred with Rodney Howard.

164.    Sheriff Click was the Chief Deputy of the Terry County Jail on March 18, 2019 when an Inspection Report by the Texas Commission on Jail Standards was issued finding Terry County staff did not conduct face-to-face observations of inmates in holding cells in accordance with the Minimum Jail Standards which required observations to be made at least every 30 minutes, but instead the jailers were exceeding these time frames.

165.    On June 25, 2019, former Terry County Sheriff Larry Gilbreath resigned after submitted a letter of resignation to the Terry County Commissioners Court.

166.    Sheriff Click, as then Chief Deputy of the Terry County Jail, become interim Sheriff of Terry County on June 25, 2019 until he was elected Sheriff of Terry County in 2020.

167.    As a result of being Chief Deputy of the Jail at the time and then interim Sheriff shortly afterward, in 2019 Sheriff Click was aware of the March 18, 2019 Inspection Report by the Texas Commission on Jail Standards finding that Terry County staff were exceeding observation time frames outlined in the Minimum Jail Standards.

168.    Sheriff Click was the interim sheriff and policymaker for Terry County with respect to the jail in September of 2019 when Rodney Howard died by suicide due to the jail's custom and practice of failing to monitor inmates, despite Sheriff Click being aware of the issue due to the March 18, 2019 Inspection Report by the Texas Commission on Jail Standards.

169.    Despite a lack of monitoring due to the practices in the Terry County Jail contributing to the death of Rodney Howard, no jailers were disciplined and no policies or practices were changed by Sheriff Click.

170.    Sheriff Click was the sheriff and policymaker for Terry County with respect to the jail in February of 2021 when Dakota died by suicide due to the jail's custom and practice of failing to monitor inmates, despite Sheriff Click being aware of the issue due to the March 18, 2019 Inspection Report by the Texas Commission on Jail Standards and the September 18, 2019 suicide by Rodney Howard with extremely similar circumstances and facts as Dakota's death, including both men being housed in the same type of segregation cell, both men having multiple suicide attempts in the Terry County Jail before actually committing suicide in the Terry County Jail, both men being placed on suicide watch multiple times and being removed shortly before their successful suicides, and both men committing suicide using the partial wall separating their bed

from their shower as the gallows by which they were able to commit suicide using ligatures in their cells.

171.    Unsurprisingly – due to the clear practice of failing to monitor inmates in the Terry County Jail – on March 4, 2021 – only a week after Dakota committed suicide due to the Terry County Jail's practice of failing to monitor at risk inmates, the Texas Commission on Jail Standards issued an Inspection Report finding that it was determined that on numerous occasions Terry County staff exceeded the 30-minute requirement to observe inmates known to be assaultive, potentially suicidal, mentally ill, or who have demonstrated bizarre behavior.

172.    Upon information and belief, discovery into information within the knowledge of the County will show that just as was the case following the death of Rodney Howard due to the Terry County Jail failing to monitor him in his segregation cell, no one was disciplined and no policy changes were made by Sheriff Click following the death of Dakota in this case – further demonstrating the accepted and ratified practices in the Terry County Jail under the direction of policymaker, Sheriff Timothy Click.

173.    Upon information and belief, discovery into information within the knowledge of the County will show that Sheriff Click promulgated, adopted, approved, and/or ratified the policies and practices discussed in this lawsuit after reviewing the policies, practices, and following the March 18, 2019 Inspection Report by the Texas Commission on Jail Standards finding Terry County staff did not conduct face-to-face observations of inmates in holding cells in accordance with the Minimum Jail Standards which required observations to be made at least every 30 minutes, but instead the jailers were exceeding these time frames.

174.    Upon information and belief, discovery into information within the knowledge of the County will show that Sheriff Click promulgated, adopted, approved, and/or ratified the

policies and practices discussed in this lawsuit after reviewing the policies, practices, and following the death of Rodney Howard on September 12, 2019 in the Terry County Jail.

175.    Upon information and belief, discovery into information within the knowledge of the County will show that Sheriff Click had constructive knowledge of the customs, practices, and de facto policies outlined in this lawsuit, as he would have known of the violations if he would have properly exercised his responsibilities…" following the March 18, 2019 Inspection Report by the Texas Commission on Jail Standards. *Hicks–Fields*, 860 F.3d at 808.

176.    Upon information and belief, discovery into information within the knowledge of the County will show that Sheriff Click had constructive knowledge of the customs, practices, and de facto policies outlined in this lawsuit, as he would have known of the violations if he would have properly exercised his responsibilities…" following the death of Rodney Howard on September 12, 2019 in the Terry County Jail. *Hicks–Fields*, 860 F.3d at 808.

177.    Upon information and belief, discovery into information within the knowledge of the County will show that Sheriff Click failed to implement corrective or remedial customs, practices, and policies following the March 18, 2019 Inspection Report by the Texas Commission on Jail Standards. *Sanchez*, 956 F.3d at 793–94.

178.    Upon information and belief, discovery into information within the knowledge of the County will show that Sheriff Click failed to implement corrective or remedial customs, practices, and policies following the death of Rodney Howard on September 12, 2019 in the Terry County Jail. *Sanchez*, 956 F.3d at 793–94.

179.    Here, Sheriff Click knowingly chose not to change policies or practices following the previous death of Rodney Howard resulting from a lack of monitoring inmates and also chose not to discipline any jailers following the death of Rodney Howard or Dakota in this case, which

shows that the complained of practices were accepted as the way things are done in the Terry County Jail. *Sanchez*, 956 F.3d at 793–94; *Grandstaff*, 767 F.2d at 171.

### Sheriff Click was Aware of His Ability to Remove Ligatures from Dakota's Cell Despite Dakota Not Being Housed on Suicide Watch

180.   Sheriff Click, as policymaker for Terry County, was aware that Dakota had attempted suicide three separate times inside of the Terry County Jail by (1) hanging himself with two bedsheets in December 2020 necessitating suicide watch; (2) cutting his wrists on January 15, 2021 necessitating suicide watch; and (3) overdosing on Trazodone on February 5, 2020.

181.   Sheriff Click was aware of these suicide attempts because pursuant to Terry County Mental Disabilities/Suicide Prevention Plan Chapter 273.5, "The Sheriff and Jail Administrator will be advised of the inmate's name and the possibility of a suicide attempt."

182.   Sheriff Click also told Plaintiff Warren on March 8, 2021 that he knew Dakota when he was younger and a patrol officer and that they were aware of his mental status.

183.   Upon information and belief, Sheriff Click knew that Dakota had been taken off suicide watch on February 8, 2021, as he was the Sheriff of the jail and his responsibility is to ensure the safety of inmates in his custody, there are only 16 segregation cells in the Terry County Jail, many of which were not being used, and Dakota had either been housed in a segregation cell or holding cell his entire incarceration in the Terry County Jail beginning November 5, 2020, Sheriff Click actually knew Dakota from when he was younger, Sheriff Click was aware of his mental health status, and no other inmate in the Terry County Jail during this period of time had attempted suicide three separate times, all of which supports the fact that Sheriff Click was aware that Dakota was being housed in a segregation cell and was no longer on suicide watch.

184.    Sheriff Click also knew that MHMR personnel would remove inmates from suicide watch who he felt should still be on suicide watch, as he told Plaintiff Warren the following during that March 8, 2021 conversation in his office:

a.    Plaintiff Warren asked why they did not have Dakota on suicide watch which is what the family had previously been told that he was on.

b.    Sheriff Click responded that they have a MHMR worker in the office and that Sheriff Click has no faith in MHMR and told Plaintiff Warren a story of when Sheriff Click was a patrol officer that he was on a call where a man was hanging himself and Sheriff Click cut him down and called EMS to take him to the hospital and sat there for four hours before MHMR arrived to speak with the man.

c.    Sheriff Click explained to Plaintiff Warren that the Terry County protocol is that when an inmate threatens suicide or attempts suicide they automatically place them on suicide watch and that it is not the Terry County staff's call to take the inmate off suicide watch, but it is MHMR's decision on when to take them off.

d.    Sheriff Click told Plaintiff Warren that a lot of times MHMR personnel go in there and talk to the inmates and immediately take them off suicide watch and he did not agree with that.

e.    Plaintiff Warren told Sheriff Click that several times his adoptive parents had called to the jail with concerns.

f.    Sheriff Click again told Plaintiff Warren that it was not up to them when an inmate is taken off of suicide watch. It was the MHMR worker that worked there.

185.    This conversation demonstrates that Sheriff Click's policy in the Terry County Jail was to allow MHMR to remove inmates from suicide watch even when Sheriff Click disagreed

with that decision based off his knowledge of the inmates that he knew the MHMR personnel did not have since they were making the decision after only a few minutes of meeting with the inmates.

186.     This conversation demonstrates that Sheriff Click still believed that Dakota was a potential suicide risk even though MHMR had removed him from suicide watch on February 8, 2021.

187.     Sheriff Click, also knew that despite an inmate not being on suicide watch, that Terry County Jail could remove items from potentially mentally disabled and/or suicidal inmates. Pursuant to Terry County Mental Disabilities/Suicide Prevention Plan Chapter 273.5,

> Any mentally disabled and/or potentially suicidal inmate will be housed in a cell with another inmate in general population, if possible. If isolation is required, constant supervision will be required.

> Steps taken to reduce the likelihood of a suicide attempt in the Terry County Jail include non-protrusion lighting. Items routinely removed from suicidal inmates include towels, blankets, shower curtains, mattress covers and any objects that may be used to harm the inmate.

188.     This policy demonstrates that even if an inmate is not officially on "suicide watch" that Terry County staff can remove items such as blankets or sheets, which Dakota used to hang himself.

189.     However, despite Sheriff Click believing that MHMR was wrong to take Dakota off suicide watch, and being aware of his three previous suicide attempts and his mental status, the Terry County Jail's practice of not monitoring inmates at elevated risk in suicide cells such as Dakota and previously Rodney Howard, as well as Rodney Howard's death by suicide in a segregation cell by hanging, Sheriff Click did not ensure that ligatures such as sheets were not given to Dakota despite Dakota having the exact same cell set up with the partial wall that Rodney Howard had which would allow Dakota to hang himself like Rodney Howard did in 2019 while

Sheriff Click was in charge.

190.    Additionally, Sheriff Click, as a sheriff that went to state conferences and received training on how to run jails and handle suicidal and mentally disabled inmates, was aware that other jails utilize a sliding scale of prevention with suicidal inmates.

191.    However, Sheriff Click did not utilize such a sliding scale and the Terry County Jail either had inmates on suicide watch with no clothing or inmates off suicide watch with access to ligatures and tie off points without being monitored.

192.    For example, the Collin County Jail utilizes a sliding scale of suicide prevention with "Red Watch," "Yellow Watch," and "Green Watch," where:

    a.    "Red Watch" is utilized when an inmate "attempted suicide during current arrest" and consists of the inmate being given a suicide smock but no other clothing, a green blanket, no white blankets, finger foods only, no commissary, no mug, no spork, no towel, no hygiene kit, and so forth.

    b.    "Yellow Watch" is utilized when an inmate "expressed/alluded to suicidal ideation or self-harm" and consists of permitting inmates use of a towel if removed after each use, dayroom privileges for shower, and one book.

    c.    "Green Watch" is utilized when an inmate is "expressing bizarre thought content" and consists of many privileges being returned to the inmate, however the inmate is still not to be issued white blankets – which can be used as ligatures to hang oneself, like Dakota did in this case.

193.    Sheriff Click, as a result of attending conferences and trainings in his capacity as a Texas Sheriff was aware that these sliding scales of suicide prevention existed, yet chose not to utilize them in the Terry County Jail.

194.    Instead, Sheriff Click utilized a policy where potentially suicidal inmates would be taken off suicide watch by MHMR personnel even when Sheriff Click disagreed, and then the inmates would be given ligatures and housed in cells with tie off points without monitoring, which not only presented them with opportunities of self-harm and suicide, but supplied them with the tools with which to accomplish the tasks.

### IV.
### Causes of Action

### Count One

### PRACTICE AND CUSTOM OF DELIBERATE INDIFFERENCE
### *Monell v. New York City Department of Social Services*
### Violation of the Fourteenth Amendment
### Pursuant to 42 U.S.C § 1983
### Defendant Terry County, Texas

195.    Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs as if fully repeated herein.

196.    Municipalities and other local governments are "persons" within the meaning of Section 1983 and can therefore be held liable for violating a person's constitutional rights. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978); *Bonilla*, 982 F.3d at 308.

197.    Municipalities are, however, responsible only for "their own legal acts." *Covington v. City of Madisonville, Tex.*, 812 F. App'x 219, 225 (5th Cir. 2020) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986)). They cannot be held liable on a *respondeat superior* theory solely because they employ a constitutional tortfeasor. *Monell*, 436 U.S. at 691–92.

198.    Plaintiff invokes two alternative theories of liability against Terry County for the death of Rodney: the "episodic acts and omissions" of County jailers, and the unconstitutional "conditions of confinement" at the County jail. *See Flores v. Cnty of Hardeman, Tex.*, 124 F.3d 736, 738 (5th Cir 1997).

199.    Plaintiff's episodic acts and omissions theory "requires a finding that particular jailers acted or failed to act with deliberate indifference to the detainee's needs" and—notably—that this conduct is attributable to the enforcement of a municipal policy, practice, or custom. *Sanchez v. Young Cnty., Tex.*, 866 F.3d 274, 279 (5th Cir. 2017).

200.    Plaintiff's conditions of confinement theory, in contrast, does not rest on the fault of individual jailers. *Id.* Rather, it challenges the conditions, practices, rules or restrictions of pretrial confinement imposed by the County that, together, "impose[] what amounts to punishment in advance of trial." *Id.*

201.    Under both theories, Plaintiff must show "(1) that a constitutional violation occurred and (2) that a municipal policy was the moving force behind the violation." *Sanchez*, 956 F.3d at 791 (quoting *Monell*, 436 U.S. at 694).

## Episodic Acts or Omissions Claim Against Defendant Terry County

202.    In an episodic acts or omissions claim against a municipality, "an actor usually is interposed between the detainee and the municipality, such that the detainee complains first of a particular act of, or omission by, the actor and then points derivatively to a policy, custom, or rule (or lack thereof) of the municipality that permitted or caused the act or omission." *Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997).

203.    To hold a municipal entity liable under this standard, the plaintiff must establish: "(1) a governmental employee acted with subjective deliberate indifference; and (2) the employee's act resulted from a policy or custom adopted or maintained with objective deliberate indifference to the plaintiff's constitutional rights." *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 526 (5th Cir. 1999).

204.    An official policy "usually exists in the form of written policy statements, ordinances, or regulations, but may also arise in the form of a widespread practice [of city officials or employees] that is 'so common and well-settled as to constitute a custom that fairly represents municipal policy.'" *James v. Harris Cnty.*, 577 F.3d 612, 617 (5th Cir. 2009) (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001)).

205.    Whatever its form, the policy must have been the "moving force" behind the plaintiff's constitutional violation. *Piotrowski*, 237 F.3d at 580 (quoting *Monell*, 436 U.S. at 694).

206.    Stated differently, Plaintiff "must show direct causation, i.e., that there was 'a direct causal link' between the policy and the violation." See *James*, 577 F.3d at 617 (quoting *Piotrowski*, 237 F.3d at 580).

207.    The policy must also have been "promulgated with deliberate indifference to the known or obvious consequences that constitutional violations would result." *Piotrowski*, 237 F.3d at 579 (internal quotation marks omitted).

208.    "A failure to adopt a policy rises to the level of deliberate indifference 'when it is obvious that the likely consequences of not adopting a policy will be a deprivation of civil rights.'" *Evans v. City of Marlin, Tex.*, 986 F.2d 104, 108 (5th Cir.1993) (quoting *Rhyne v. Henderson Cnty.*, 973 F.2d 386, 392 (5th Cir. 1992)).

209.    Establishing deliberate indifference on the part of a municipality generally requires a "pattern of similar violations" arising from a policy "so clearly inadequate as to be 'obviously likely to result in a constitutional violation.'" *Burge v. Saint Tammany Par.*, 336 F.3d 363, 370 (5th Cir. 2003) (quoting *Thompson v. Upshur Cnty.*, 245 F.3d 447, 459 (5th Cir. 2001)). A narrow 'single incident' exception to the pattern requirement, however, has been recognized. *Id.* at 372–73; *Covington v. City of Madisonville, Tex.*, 812 F. App'x 219, 225 (5th Cir. 2020). For deliberate

indifference to be based on a single incident, "it should have been apparent to the policymaker that a constitutional violation was the highly predictable consequence of a particular policy." *Alvarez v. City of Brownsville*, 904 F.3d 382, 390 (5th Cir. 2018) (quoting *Burge*, 336 F.3d at 373).

210.    Each of Defendants Peterson and Jacquez, despite their subjective knowledge that Rodney was a suicide risk due to his prior suicide attempts and periods of time being held on suicide watch, and the fact that he was being held in segregation chose not to monitor Dakota via video or with more frequent face to face contacts, but instead to ignore Dakota and falsify records stating he was checked on when the truth was that he was not, and these actions were taken as a result of Terry County's policies and practices outlined in this lawsuit and put into place or ratified by the Terry County policymaker, Defendant Sheriff Click.

## Conditions of Confinement Claim Against Defendant Terry County

211.    A challenge to a condition of confinement is a challenge to "general conditions, practices, rules, or restrictions of pretrial confinement." *Hare v. City of Corinth*, 74 F. 3d 633, 644–45 (5th Cir. 1996).

212.    The issue is whether the conditions "amount to punishment." *Bell*, 441 U.S. at 535.

213.    As has been explained, "if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the government action is punishment that may not constitutionally be inflicted upon detainees.'" *Bell v. Wolfish*, 441 U.S. 520, 539 (1979); *Garza v. City of Donna*, 922 F.3d 626, 632 (5th Cir. 2019).

214.    If Defendant Terry County wishes to incarcerate suicidal pretrial detainees, it has a constitutional responsibility to ensure that its conditions do not amount to "punishment" in advance of trial.

215.    To prove a conditions of confinement claim, the plaintiff must show (1) a rule or restriction, an intended condition or practice, or a *de facto* policy as evidenced by sufficiently extended or pervasive acts of jail officials, (2) not reasonably related to a legitimate governmental objective, and (3) that violated [the detainee's] constitutional rights. *Shepherd v. Dallas Cnty.*, 591 F.3d 445, 452, 454–55 (5th Cir. 2009).

216.    An official policy "usually exists in the form of written policy statements, ordinances, or regulations, but may also arise in the form of a widespread practice [of city officials or employees] that is 'so common and well-settled as to constitute a custom that fairly represents municipal policy.'" *James v. Harris Cnty.*, 577 F.3d 612, 617 (5th Cir. 2009) (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001)).

217.    Whatever its form, the policy must have been the "moving force" behind the plaintiff's constitutional violation. *Piotrowski*, 237 F.3d at 580 (quoting *Monell*, 436 U.S. at 694).

218.    Stated differently, Plaintiff "must show direct causation, i.e., that there was 'a direct causal link' between the policy and the violation." See *James*, 577 F.3d at 617 (quoting *Piotrowski*, 237 F.3d at 580).

219.    The policy must also have been "promulgated with deliberate indifference to the known or obvious consequences that constitutional violations would result." *Piotrowski*, 237 F.3d at 579 (internal quotation marks omitted).

220.    "A failure to adopt a policy rises to the level of deliberate indifference 'when it is obvious that the likely consequences of not adopting a policy will be a deprivation of civil rights.'" *Evans v. City of Marlin, Tex.*, 986 F.2d 104, 108 (5th Cir.1993) (quoting *Rhyne v. Henderson Cnty.*, 973 F.2d 386, 392 (5th Cir. 1992)).

221.    Establishing deliberate indifference on the part of a municipality generally requires a "pattern of similar violations" arising from a policy "so clearly inadequate as to be 'obviously likely to result in a constitutional violation.'" *Burge v. Saint Tammany Par.*, 336 F.3d 363, 370 (5th Cir. 2003) (quoting *Thompson v. Upshur Cnty.*, 245 F.3d 447, 459 (5th Cir. 2001)). A narrow 'single incident' exception to the pattern requirement, however, has been recognized. *Id.* at 372–73; *Covington v. City of Madisonville, Tex.*, 812 F. App'x 219, 225 (5th Cir. 2020).

222.    For deliberate indifference to be based on a single incident, "it should have been apparent to the policymaker that a constitutional violation was the highly predictable consequence of a particular policy." *Alvarez v. City of Brownsville*, 904 F.3d 382, 390 (5th Cir. 2018) (quoting *Burge*, 336 F.3d at 373).

223.    As the Fifth Circuit stated, "[w]e have never held, and we will not now suggest, that multiple suicides must occur in the same cell before a jail official is required to take preventative measures." *Converse v. City of Kemah, Texas*, 961 F.3d 771, 777 (5th Cir. 2020).

224.    In the Fifth Circuit, a conditions of confinement claim "requires no showing of specific intent on the part of the [municipality]." *Sanchez*, 866 F.3d at 279; *Edler v. Hockley Cnty. Comm'rs Ct.*, 589 F. App'x 664, 669 (5th Cir. 2014) ("[U]nlike an episodic-act-or-omission claim, a plaintiff is not required to prove deliberate indifference.").

225.    Although an unlawful condition or practice is often explicit, a "formal, written policy is not required." *Montano v. Orange Cnty., Tex.*, 842 F.3d 865, 875 (5th Cir. 2016); see *Shepherd*, 591 F.3d at 452.

226.    A condition may "reflect an unstated or *de facto* policy, as evidenced by a pattern of acts or omissions 'sufficiently extended or pervasive, or otherwise typical of extended or

pervasive misconduct by [jail] officials, to prove an intended condition or practice.'" *Shepherd*, 591 F.3d at 452 (quoting *Hare*, 74 F.3d at 645).

227.    As noted by the Fifth Circuit, "specific [prior] examples are not required to meet the 'conditions or practice' element" when there is consistent testimony of jail employees, *Montano*, 842 F.3d at 875 ("Given the striking uniformity of the jail employees' testimony, further evidence was not required for a reasonable juror to infer a *de facto* policy for conditions or practices."), or **the policy maker knows about a misconduct yet fails to take remedial action**, *Sanchez*, 956 F.3d at 793–94.

228.    When multiple employees act in the same unconstitutional manner, that is indicative of a *de facto* policy. *See Sanchez*, 956 F.3d at 793 (finding that evidence that the county's written policies were ignored created fact-issues as to whether the jail had a *de facto* policy of inadequately monitoring intoxicated detainees).

229.    "We do not require a plaintiff to show that a 'policy or practice [was] the exclusive cause of the constitutional deprivation.' Courts 'may . . . consider how individual policies or practices interact with one another within the larger system.'" *See Sanchez*, 956 F.3d at 791.

230.    Municipal liability may attach where the constitutional deprivation is pursuant to a governmental custom, even if such custom has not received formal approval. *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 166 (5th Cir. 2010) (citing *Monell*, 436 U.S. at 690–91).

231.    A *de facto* policy can be found when none of the jailers face any reprimand after an inmate's death, or when a municipality fails to take any evident action to correct the jail's alleged deficiencies. *See Sanchez*, 956 F.3d at 793 (finding that "fail[ure] to take remedial action ... arguably shows acquiescence to the misconduct such that a jury could conclude that it represents official policy.") (citing *Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir. 1985) (holding

that, because the city policymaker failed to change policies or to discipline or reprimand officials, the jury was entitled to conclude that the complained-of practices were "accepted as the way things are done and have been done in" that city)).

232.    The plaintiff may demonstrate a "persistent widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Zarnow*, 614 F.3d at 168–69 (quoting *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir.1984).

233.    "Under the decisions of the Supreme Court and [the Fifth Circuit], municipal liability under section 1983 requires proof of three elements: a policy maker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (citing *Monell*, 436 U.S. at 694).

234.    A municipality "cannot be liable for an unwritten custom unless '[a]ctual or constructive knowledge of such custom' is attributable to a city policymaker." *Pena v. City of Rio Grande City*, 879 F.3d 613, 623 (5th Cir. 2018) (citing *Hicks–Fields v. Harris Cty.*, 860 F.3d 803, 808 (5th Cir. 2017)).

235.    To establish municipal liability under § 1983 based on an alleged "persistent widespread practice or custom that is so common it could be said to represent municipal policy, actual or constructive knowledge of such practice or custom must be shown." *Malone v. City of Fort Worth*, 297 F. Supp. 3d 645, 654 (N.D. Tex. 2018) (citing *Hicks–Fields*, 860 F.3d at 808).

236.    "Constructive knowledge may be attributed to the governing body on the ground that it would have known of the violations if it had properly exercised its responsibilities…" *Hicks–Fields*, 860 F.3d at 808.

237.    The Supreme Court has described an actionable Monell policy as "a course of action consciously chosen among various alternatives." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823, 105 S. Ct. 2427, 2436, 85 L. Ed. 2d 791 (1985).

238.    A decision to adopt a particular course of conduct represents official policy even if it is not intended to govern future conduct so long as the decision was made by a final policymaker. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986).

239.    Where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly. *Id*.

240.    Municipal liability under § 1983 attaches where a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question. *Pembaur*, 475 U.S. at 483, 106 S. Ct. at 1300.

## POLICYMAKER

### Sheriff Click

241.    The identification of policymaking officials is a question of state law. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988).

242.    Under Texas law, sheriffs are "final policymakers" in the area of law enforcement for the purposes of holding a county liable under § 1983. *James v. Harris Cty.*, 577 F.3d 612, 617 (5th Cir. 2009); citing *Williams v. Kaufman County*, 352 F.3d 994, 1013 (5th Cir.2003).

243.    Click is the sheriff of Terry County, and was the sheriff of Terry County at all times relevant to this lawsuit.

244.    Accordingly, Click is and was the final policymaker for Terry County.

245. Sheriff Click was the Chief Deputy of the Terry County Jail on March 18, 2019 when an Inspection Report by the Texas Commission on Jail Standards was issued finding Terry County staff did not conduct face-to-face observations of inmates in holding cells in accordance with the Minimum Jail Standards which required observations to be made at least every 30 minutes, but instead the jailers were exceeding these time frames.

246. On June 25, 2019, former Terry County Sheriff Larry Gilbreath resigned after submitted a letter of resignation to the Terry County Commissioners Court.

247. Sheriff Click, as then Chief Deputy of the Terry County Jail, become interim Sheriff of Terry County on June 25, 2019 until he was elected Sheriff of Terry County in 2020.

248. As a result of being Chief Deputy of the Jail at the time and then interim Sheriff shortly afterward, in 2019 Sheriff Click was aware of the March 18, 2019 Inspection Report by the Texas Commission on Jail Standards finding that Terry County staff were exceeding observation time frames outlined in the Minimum Jail Standards.

249. Sheriff Click was the interim sheriff and policymaker for Terry County with respect to the jail in September of 2019 when Rodney Howard died by suicide due to the jail's custom and practice of failing to monitor inmates, despite Sheriff Click being aware of the issue due to the March 18, 2019 Inspection Report by the Texas Commission on Jail Standards.

250. Despite a lack of monitoring due to the practices in the Terry County Jail contributing to the death of Rodney Howard, no jailers were disciplined and no policies or practices were changed by Sheriff Click.

251. Sheriff Click was the sheriff and policymaker for Terry County with respect to the jail in February of 2021 when Dakota died by suicide due to the jail's custom and practice of failing to monitor inmates, despite Sheriff Click being aware of the issue due to the March 18, 2019

Inspection Report by the Texas Commission on Jail Standards and the September 18, 2019 suicide by Rodney Howard with extremely similar circumstances and facts as Dakota's death, including both men being housed in the same type of segregation cell, both men having multiple suicide attempts in the Terry County Jail before actually committing suicide in the Terry County Jail, both men being placed on suicide watch multiple times and being removed shortly before their successful suicides, and both men committing suicide using the partial wall separating their bed from their shower as the gallows by which they were able to commit suicide using ligatures in their cells.

252.   Unsurprisingly – due to the clear practice of failing to monitor inmates in the Terry County Jail – on March 4, 2021 – only a week after Dakota committed suicide due to the Terry County Jail's practice of failing to monitor at risk inmates, the Texas Commission on Jail Standards issued an Inspection Report finding that it was determined that on numerous occasions Terry County staff exceeded the 30-minute requirement to observe inmates known to be assaultive, potentially suicidal, mentally ill, or who have demonstrated bizarre behavior.

253.   Upon information and belief, discovery into information within the knowledge of the County will show that just as was the case following the death of Rodney Howard due to the Terry County Jail failing to monitor him in his segregation cell, no one was disciplined and no policy changes were made by Sheriff Click following the death of Dakota in this case – further demonstrating the accepted and ratified practices in the Terry County Jail under the direction of policymaker, Sheriff Timothy Click.

254.   Upon information and belief, discovery into information within the knowledge of the County will show that Sheriff Click promulgated, adopted, approved, and/or ratified the policies and practices discussed in this lawsuit after reviewing the policies, practices, and

following the March 18, 2019 Inspection Report by the Texas Commission on Jail Standards finding Terry County staff did not conduct face-to-face observations of inmates in holding cells in accordance with the Minimum Jail Standards which required observations to be made at least every 30 minutes, but instead the jailers were exceeding these time frames.

255.    Upon information and belief, discovery into information within the knowledge of the County will show that Sheriff Click promulgated, adopted, approved, and/or ratified the policies and practices discussed in this lawsuit after reviewing the policies, practices, and following the death of Rodney Howard on September 12, 2019 in the Terry County Jail.

256.    Upon information and belief, discovery into information within the knowledge of the County will show that Sheriff Click had constructive knowledge of the customs, practices, and de facto policies outlined in this lawsuit, as he would have known of the violations if he would have properly exercised his responsibilities…" following the March 18, 2019 Inspection Report by the Texas Commission on Jail Standards. *Hicks–Fields*, 860 F.3d at 808.

257.    Upon information and belief, discovery into information within the knowledge of the County will show that Sheriff Click had constructive knowledge of the customs, practices, and de facto policies outlined in this lawsuit, as he would have known of the violations if he would have properly exercised his responsibilities…" following the death of Rodney Howard on September 12, 2019 in the Terry County Jail. *Hicks–Fields*, 860 F.3d at 808.

258.    Upon information and belief, discovery into information within the knowledge of the County will show that Sheriff Click failed to implement corrective or remedial customs, practices, and policies following the March 18, 2019 Inspection Report by the Texas Commission on Jail Standards.. *Sanchez*, 956 F.3d at 793–94.

259.    Upon information and belief, discovery into information within the knowledge of the County will show that Sheriff Click failed to implement corrective or remedial customs, practices, and policies following the death of Rodney Howard on September 12, 2019 in the Terry County Jail. *Sanchez*, 956 F.3d at 793–94.

260.    Here, Sheriff Click knowingly chose not to change policies or practices following the previous death of Rodney Howard resulting from a lack of monitoring inmates and also chose not to discipline any jailers following the death of Mr. Howard or Dakato in this case, which shows that the complained of practices were accepted as the way things are done in the Terry County Jail. *Sanchez*, 956 F.3d at 793–94; *Grandstaff*, 767 F.2d at 171.

### Sheriff Click was Aware of His Ability to Remove Ligatures from Dakota's Cell Despite Dakota Not Being Housed on Suicide Watch

261.    Sheriff Click, as policymaker for Terry County, was aware that Dakota had attempted suicide three separate times inside of the Terry County Jail by (1) hanging himself with two bedsheets in December 2020 necessitating suicide watch; (2) cutting his wrists on January 15, 2021 necessitating suicide watch; and (3) overdosing on Trazodone on February 5, 2020.

262.    Sheriff Click was aware of these suicide attempts because pursuant to Terry County Mental Disabilities/Suicide Prevention Plan Chapter 273.5, "The Sheriff and Jail Administrator will be advised of the inmate's name and the possibility of a suicide attempt."

263.    Sheriff Click also told Plaintiff Warren on March 8, 2021 that he knew Dakota when he was younger and a patrol officer and that they were aware of his mental status.

264.    Upon information and belief, Sheriff Click knew that Dakota had been taken off suicide watch on February 8, 2021, as he was the Sheriff of the jail and his responsibility is to ensure the safety of inmates in his custody, there are only 16 segregation cells in the Terry County Jail, many of which were not being used, and Dakota had either been housed in a segregation cell

71

or holding cell his entire incarceration in the Terry County Jail beginning November 5, 2020, Sheriff Click actually knew Dakota from when he was younger, Sheriff Click was aware of his mental health status, and no other inmate in the Terry County Jail during this period of time had attempted suicide three separate times, all of which supports the fact that Sheriff Click was aware that Dakota was being housed in a segregation cell and was no longer on suicide watch.

265.    Sheriff Click also knew that MHMR personnel would remove inmates from suicide watch who he felt should still be on suicide watch, as he told Plaintiff Warren the following during that March 8, 2021 conversation in his office:

a.    Plaintiff Warren asked why they did not have Dakota on suicide watch which is what the family had previously been told that he was on.

b.    Sheriff Click responded that they have a MHMR worker in the office and that Sheriff Click has no faith in MHMR and told Plaintiff Warren a story of when Sheriff Click was a patrol officer that he was on a call where a man was hanging himself and Sheriff Click cut him down and called EMS to take him to the hospital and sat there for four hours before MHMR arrived to speak with the man.

c.    Sheriff Click explained to Plaintiff Warren that the Terry County protocol is that when an inmate threatens suicide or attempts suicide they automatically place them on suicide watch and that it is not the Terry County staff's call to take the inmate off suicide watch, but it is MHMR's decision on when to take them off.

d.    Sheriff Click told Plaintiff Warren that a lot of times MHMR personnel go in there and talk to the inmates and immediately take them off suicide watch and he did not agree with that.

    e.   Plaintiff Warren told Sheriff Click that several times his adoptive parents had called to the jail with concerns.

    f.   Sheriff Click again told Plaintiff Warren that it was not up to them when an inmate is taken off of suicide watch. It was the MHMR worker that worked there.

266.    This conversation demonstrates that Sheriff Click's policy in the Terry County Jail was to allow MHMR to remove inmates from suicide watch even when Sheriff Click disagreed with that decision based off his knowledge of the inmates that he knew the MHMR personnel did not have since they were making the decision after only a few minutes of meeting with the inmates.

267.    This conversation demonstrates that Sheriff Click still believed that Dakota was a potential suicide risk even though MHMR had removed him from suicide watch on February 8, 2021.

268.    Sheriff Click, also knew that despite an inmate not being on suicide watch, that Terry County Jail could remove items from potentially mentally disabled and/or suicidal inmates. Pursuant to Terry County Mental Disabilities/Suicide Prevention Plan Chapter 273.5,

> Any mentally disabled and/or potentially suicidal inmate will be housed in a cell with another inmate in general population, if possible. If isolation is required, constant supervision will be required.

> Steps taken to reduce the likelihood of a suicide attempt in the Terry County Jail include non-protrusion lighting. Items routinely removed from suicidal inmates include towels, blankets, shower curtains, mattress covers and any objects that may be used to harm the inmate.

269.    This policy demonstrates that even if an inmate is not officially on "suicide watch" that Terry County staff can remove items such as blankets or sheets, which Dakota used to hang himself.

270.    However, despite Sheriff Click believing that MHMR was wrong to take Dakota

off suicide watch, and being aware of his three previous suicide attempts and his mental status, the Terry County Jail's practice of not monitoring inmates at elevated risk in suicide cells such as Dakota and previously Rodney Howard, as well as Rodney Howard's death by suicide in a segregation cell by hanging, Sheriff Click did not ensure that ligatures such as sheets were not given to Dakota despite Dakota having the exact same cell set up with the partial wall that Rodney Howard had which would allow Dakota to hang himself like Rodney Howard did in 2019 while Sheriff Click was in charge.

271.    Additionally, Sheriff Click, as a sheriff that went to state conferences and received training on how to run jails and handle suicidal and mentally disabled inmates, was aware that other jails utilize a sliding scale of prevention with suicidal inmates.

272.    However, Sheriff Click did not utilize such a sliding scale and the Terry County Jail either had inmates on suicide watch with no clothing or inmates off suicide watch with access to ligatures and tie off points without being monitored.

273.    For example, the Collin County Jail utilizes a sliding scale of suicide prevention with "Red Watch," "Yellow Watch," and "Green Watch," where:

g.    "Red Watch" is utilized when an inmate "attempted suicide during current arrest" and consists of the inmate being given a suicide smock but no other clothing, a green blanket, no white blankets, finger foods only, no commissary, no mug, no spork, no towel, no hygiene kit, and so forth.

h.    "Yellow Watch" is utilized when an inmate "expressed/alluded to suicidal ideation or self-harm" and consists of permitting inmates use of a towel if removed after each use, dayroom privileges for shower, and one book.

i.    "Green Watch" is utilized when an inmate is "expressing bizarre thought content"

and consists of many privileges being returned to the inmate, however the inmate

is still not to be issued white blankets – which can be used as ligatures to hang

oneself, like Dakota did in this case.

274. Sheriff Click, as a result of attending conferences and trainings in his capacity as a

Texas Sheriff was aware that these sliding scales of suicide prevention existed, yet chose not to

utilize them in the Terry County Jail.

275. Instead, Sheriff Click utilized a policy where potentially suicidal inmates would be

taken off suicide watch by MHMR personnel even when Sheriff Click disagreed, and then the

inmates would be given ligatures and housed in cells with tie off points without monitoring, which

not only presented them with opportunities of self-harm and suicide, but supplied them with the

tools with which to accomplish the tasks.

### Policy, Custom, and Practice
### Which was Moving Force of Constitutional Violations

276. The § 1983 causation component requires that the plaintiff identify, with

particularity, the policies or practices they allege cause the constitutional violation, and

demonstrate a "direct causal link." *M. D. by Stukenberg v. Abbott*, 907 F.3d 237, 255 (5th Cir.

2018); *see Piotrowski*, 237 F.3d at 580.

277. The Fifth Circuit does not, however, require the court to consider each policy or

practice in a vacuum. *Id*. The court may properly consider how individual policies or practices

interact with one another within the larger system and how the harmful effects of some policies

are exacerbated by others. *Id*.

278. The Supreme Court has described an actionable *Monell* policy as "a course of action

consciously chosen among various alternatives." *City of Oklahoma City v. Tuttle*, 471 U.S. 808,

823, 105 S. Ct. 2427, 2436, 85 L. Ed. 2d 791 (1985).

279.    Click, the final policymaker for Terry County, consciously chose each of the policies outlined in this lawsuit over various available alternatives.

### Policy, Custom, Practice, and Culture of
### Failing to Monitor Inmates with Increased Risk

280.    "A failure to adopt a policy rises to the level of deliberate indifference 'when it is obvious that the likely consequences of not adopting a policy will be a deprivation of civil rights.'" *Evans*, 986 F.2d at 108.

281.    The County's policies caused people incarcerated at the Terry County Jail to be unmonitored despite there being information available to the jail to warrant monitoring and the availability of video feeds and face to face checks for the monitoring to occur.

282.    The County had a pattern, practice, or *de facto* policy of failing to adequately monitor inmates via face to face checks or through video monitoring as shown through repeated reports from the Texas Commission on Jail standards and the deaths of Rodney Howard and now Dakota, despite these inmates being housed with ligatures, in cells with tie off points, and without timely face to face checks or video monitoring at all.

283.    The Fifth Circuit has repeatedly held that pretrial detainees have a Fourteenth Amendment right to be protected from a known risk of suicide. *Converse v. City of Kemah, Texas*, 961 F.3d 771, 775 (5th Cir. 2020); *Jacobs v. W. Feliciana Sheriff's Dep't*, 228 F.3d 388, 393 (5th Cir. 2000); *Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1996).

284.    And it is well-settled law that jail officials violate this right if "they had gained actual knowledge of the substantial risk of suicide and responded with deliberate indifference." *Converse*, 961 F.3d at 775; *Hare*, 74 F.3d at 650; *Jacobs*, 228 F.3d at 393.

285.    As the Fifth Circuit stated, "[w]e have never held, and we will not now suggest, that multiple suicides must occur in the same cell before a jail official is required to take preventative measures." *Converse*, 961 F.3d 771, 777 (5th Cir. 2020).

286.    Plaintiffs have pleaded detailed facts above, relevant to failures to monitor and protect, which are incorporated as if set-out fully herein which support:

a.    Official policies, longstanding practices and/or customs existed at the Terry County Jail which were implemented by the final policymaking official for the County, Sheriff Click.

b.    The policymaker for the County, Sheriff Click, knew or should have known about the policies and/or practices and customs which created *de facto* policies at the Terry County Jail;

c.    The policymaker for the County, Sheriff Click, was deliberately indifferent in promulgating these policies and/or permitting these *de facto* policies to persist; and

d.    The County's policies and/or customs were the moving force leading to the constitutional violation of failing to monitor or protect Dakota, causing his injuries and ultimately his death.

287.    Plaintiffs have pleaded facts to support that the County was deliberately indifferent because they disregarded known or obvious consequence of their policies and practices. The County clearly knew of the policies and knew that these policies were likely to cause constitutional violations by way of the obvious nature of not monitoring persons in their custody and control as well as the death of Rodney Howard and the report by the Texas Commission on Jail Standards outlined above which were caused by these very issues.

288.    The County's policies and practices include each policy listed in this lawsuit, which include, but are not limited to:

1) Failure to monitor inmates in holding cells with face-to-face checks in compliance with the minimum jail standards articulated by the Texas Commission on Jail Standards.

2) Failure to monitor inmates in holding cells through use of video monitoring which was accessible and available in the holding cells.

    i. Dakota Brannen's biological mother, Plaintiff Casondra Warren went to the Terry County Jail on the morning of March 8, 2021and met with Sheriff Click. Sheriff Click showed her the live video feed from the cell where Dakota had died, which was empty at the time he showed her. Sheriff Click apologized and told her it was his fault. Sheriff Click explained that they are understaffed and there was one person in the picket to watch 96 cameras, pop doors, and answer phones. Plaintiff Warren said to Sheriff Click that with the time they have on camera of Dakota preparing to kill himself they should have noticed it at some point. Sheriff Click agreed and again said that it was his fault. Sheriff Click told her they were aware of Dakota's mental status.

3) Failure to provide increased observations of inmates, such as Dakota, and previously Rodney Howard, who displayed severe mental illness and had attempted suicide multiple times in the Terry County Jail;

4) Failure to house inmates, such as Dakota, and previously Rodney Howard, in padded cells without tie off points after the inmates displayed severe mental illness and had attempted suicide multiple times in the Terry County Jail;

5) Failure to remove ligatures from inmates, such as Dakota, and previously Rodney Howard, after the inmates displayed severe mental illness and had attempted suicide multiple times in the Terry County Jail;

6) Housing inmates, such as Dakota, and previously Rodney Howard, in cells with tie off points despite not removing ligatures from them before housing and then failing to monitor them through face to face checks or through video monitoring, despite the inmates displaying severe mental illness and had attempted suicide multiple times in the Terry County Jail.

7) Requiring communications personnel (dispatchers) to fulfill duties of supervision and care of prisoners, when they could not do so while fulfilling duties in the dispatch area; and

   i. According to Terry County Jailer Dominique Dominguez, the Terry County jailer responsible for working in the control room is responsible for monitoring approximately 93 cameras throughout the jail, for opening/closing doors, for answering intercom calls from the inmates in the jail, assisting with booking in new inmates and completing booking paperwork, answering the jail phone, answering the emergency 911 line, and for maintaining paperwork and logs of the issues that occurred and arose during the shift; thus, the Terry County Jail's policy amounts to a practice of not monitoring the video feeds in cells while also knowing that

adequate face to face monitoring is not being done due to the jail being understaffed and each jailer being required to perform too many duties to allow them to adequately monitor inmates. As the jailer in the control room I could not leave the control room, so when things were needed in the jail it was my job to task the jailers in the jail with carrying out those tasks or dealing with inmate requests.

    ii.  Dakota Brannen's biological mother, Plaintiff Casondra Warren went to the Terry County Jail on the morning of March 8, 2021and met with Sheriff Click. Sheriff Click showed her the live video feed from the cell where Dakota had died, which was empty at the time he showed her. Sheriff Click apologized and told her it was his fault. Sheriff Click explained that they are understaffed and there was one person in the picket to watch 96 cameras, pop doors, and answer phones. Plaintiff Warren said to Sheriff Click that with the time they have on camera of Dakota preparing to kill himself they should have noticed it at some point. Sheriff Click agreed and again said that it was his fault. Sheriff Click told her they were aware of Dakota's mental status.

8)  The Terry County Jail was understaffed as it did not have enough guards available to monitor the cell videos or to adequately complete cell checks in compliance with minimum jail standards while also completing their other guard duties.

    i.  According to Terry County Jailer Dominique Dominguez, the Terry County jailer responsible for working in the control room is responsible for monitoring approximately 93 cameras throughout the jail, for

opening/closing doors, for answering intercom calls from the inmates in the jail, assisting with booking in new inmates and completing booking paperwork, answering the jail phone, answering the emergency 911 line, and for maintaining paperwork and logs of the issues that occurred and arose during the shift; thus, the Terry County Jail's policy amounts to a practice of not monitoring the video feeds in cells while also knowing that adequate face to face monitoring is not being done due to the jail being understaffed and each jailer being required to perform too many duties to allow them to adequately monitor inmates. As the jailer in the control room I could not leave the control room, so when things were needed in the jail it was my job to task the jailers in the jail with carrying out those tasks or dealing with inmate requests.

ii.  Dakota Brannen's biological mother, Plaintiff Casondra Warren went to the Terry County Jail on the morning of March 8, 2021and met with Sheriff Click. Sheriff Click showed her the live video feed from the cell where Dakota had died, which was empty at the time he showed her. Sheriff Click apologized and told her it was his fault. Sheriff Click explained that they are understaffed and there was one person in the picket to watch 96 cameras, pop doors, and answer phones. Plaintiff Warren said to Sheriff Click that with the time they have on camera of Dakota preparing to kill himself they should have noticed it at some point. Sheriff Click agreed and again said that it was his fault.

9) Utilizing a policy where potentially suicidal inmates would be taken off suicide watch by MHMR personnel even when Sheriff Click disagreed, and then the inmates would be given ligatures and housed in cells with tie off points without monitoring, which not only presented them with opportunities of self-harm and suicide, but supplied them with the tools with which to accomplish the tasks

10) Not utilizing a sliding scale at the Terry County Jail which effectively resulted in inmates either being housed on suicide watch with no clothing or inmates were taken off suicide watch and housed with access to ligatures and tie off points without being monitored. This policy did not allow for inmates to be housed off suicide watch but to have restrictions such as no blankets or towels like is utilized at other County jails in Texas, such as the Collin County jail.

11) Maintaining a policy where MHMR personnel remove inmates from suicide watch after only meeting with them for a few minutes despite Sheriff Click knowing more information about the behaviors of the inmates and feeling that the inmates still pose a risk of suicide.

12) Not meeting with the MHMR personnel to discuss the inmates' behaviors to help in a decision regarding removal from suicide watch or restrictions to certain items and ligatures.

289.    It is clear that the harmful effects of all of the County's *de facto* policies and practices exacerbated the harmful effects of each other as they lead to a perfect storm of a failure to adequately monitor Dakota, and previously Rodney Howard, or to remove his ligatures or house him in a cell without tie off points despite these men displaying severe mental illness and having attempted suicide multiple times in the Terry County Jail.

290.    This Court is not required to consider each policy or practice in a vacuum but may instead properly consider how each individual policy or practice interacts with one another within the larger system which the County put together and how the harmful effects of many of the County's *de facto* policies are exacerbated by others. *M. D. by Stukenberg*, 907 F.3d at 255; *See Piotrowski*, 237 F.3d at 580.

291.    None of the County's policies, practices, customs, or *de facto* policies outlined in this lawsuit are reasonably related to a legitimate governmental objective – to the contrary, there is a legitimate government objective in monitoring the inmates and keeping them protected from themselves as the jail maintains a duty to protect those in its custody and care.

292.    Upon information and belief, discovery into information within the knowledge of the County will show that the County's policymaker consciously chose each of the policies, practices, customs, and *de facto* policies outlined in this lawsuit over various available alternatives, despite knowledge that constitutional violations including deaths would occur if not changed.

293.    Upon information and belief, discovery into information within the knowledge of the County will show that the County's policymaker consciously chose not to alter or remedy each of the policies, practices, customs, and *de facto* policies outlined in this lawsuit following the death of Rodney Howard as well as the report from the Texas Commission on Jail Standards, despite knowledge that constitutional violations including deaths would occur if not changed – resulting in the death of Dakota in this case.

294.    Each of the Terry County officers were acting pursuant to the County's deliberately indifferent policies, practices, customs, and *de facto* policies which were implemented and not revised under the supervision of Sheriff Click, when Dakota was not adequately monitored using face to face checks, not monitored at all using video monitoring available in the cell, housed with

a ligature, and housed with a tie off point in his cell despite displaying severe mental illness and having attempted suicide multiple times in the Terry County Jail.

295.    As a result of these unconstitutional policies, practices, customs, and *de facto* policies, Dakota was not protected in violation of his rights pursuant to the Fourteenth Amendment to the United States Constitution and he suffered physical injury, physical pain and suffering, mental anguish and emotional distress, and died.

296.    These injuries were not caused by any other means.

### Count Two

### FAILURE TO PROTECT
**Violation of the Fourteenth Amendment Pursuant to 42 U.S.C. § 1983**
**Defendants Click, Peters, Jacquez, Faulkner, Ramirez, Morales, McElfresh, Moya, Collazo,**
**Clark, and Faubion**

297.    Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs as if fully repeated herein.

298.    The Fifth Circuit has repeatedly held that pretrial detainees have a Fourteenth Amendment right to be protected from a known risk of suicide. *Converse*, 961 F.3d at 775; *Jacobs*, 228 F.3d at 393; *Hare*, 74 F.3d at 639.

299.    And it is well-settled law that jail officials violate this right if "they had gained actual knowledge of the substantial risk of suicide and responded with deliberate indifference." *Converse*, 961 F.3d at 775; *Hare*, 74 F.3d at 650; *Jacobs*, 228 F.3d at 393.

300.    As the Fifth Circuit stated, "[w]e have never held, and we will not now suggest, that multiple suicides must occur in the same cell before a jail official is required to take preventative measures." *Converse*, 961 F.3d 771, 777 (5th Cir. 2020).

301.    Since at least 1989, it has been clearly established that officials may be held liable for their acts or omissions that result in a detainee's suicide if they "had subjective knowledge of

a substantial risk of harm to a pretrial detainee but responded with deliberate indifference to that risk." *Converse*, 961 F.3d at 775; *Jacobs*, 228 F.d at 393-94; quoting *Hare*, 74 F.3d at 650; *see also Flores v. County of Hardeman*, 124 F.3d 736, 738 (5th Cir. 1997) ("A detainee's right to adequate protection from known suicidal tendencies was clearly established when Flores committed suicide in January 1990.").

302.    A prison official will not be held liable if he merely "should have known" of a risk; instead, to satisfy this high standard, a prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Converse*, 961 F.3d at 775; *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

303.    An official shows a deliberate indifference to that risk "by failing to take reasonable measures to abate it." *Converse*, 961 F.3d at 775–76; *Hare II*, 74 F.3d at 648.

304.    Dakota had a constitutional right to be protected from a known risk of suicide as a pretrial detainee under the Fourteenth Amendment. *Converse*, 961 F.3d at 775.

305.    Episodic acts or omissions occur where the complained-of harm is a particular act or omission of one or more officials. *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 645 (5th Cir. 1996).

306.    As to the individual in an episodic-acts-or-omissions claim, the relevant question becomes "whether that official breached his constitutional duty to tend to the basic human needs of persons in his charge…" *Est. of Henson v. Wichita Cty., Tex.*, 795 F.3d 456, 463–64 (5th Cir. 2015).

307.    "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from

circumstantial evidence . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994).

308.    An official's actual knowledge of a substantial risk may only be inferred if the "substantial risk" was obvious. *Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006).

**Defendant Click was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed.**

309.    Defendant Click was aware of and ignored obvious indicia of a risk of serious harm, specifically including but not limited to, the facts that Dakota was suicidal, as Defendant Click was Sheriff of the Terry County Jail, per Terry County policy, Defendant Click would have been advised that Dakota attempted suicide on December 17, 2020 by hanging, per Terry County policy, Defendant Click would have been advised that Dakota attempted suicide on January 15, 2021 by cutting his wrists, per Terry County policy, Defendant Click would have been advised that Dakota attempted suicide on February 5, 2021 by overdose, Defendant Click told Plaintiff Warren that he knew Dakota from when he was younger, Defendant Click told Plaintiff Warren that he was aware of Dakota's mental status, Defendant Click told Plaintiff Warren this was his fault, Defendant Click admitted that he disagreed with MHMR taking Dakota off suicide watch but claimed it was out of his control, Defendant Click was aware that there was a practice in the Terry County Jail of not adequately monitoring inmates in segregation cells like Dakota, and previously Rodney Howard, as a result of the Texas Commission on Jail Standards Investigation Report from 2019 and Rodney Howard's suicide in a segregation cell, Defendant Click knew that since Dakota was not being housed on "suicide watch" that he had access to ligatures and the same tie off point used by Rodney Howard in 2019 – the partial wall; this is believed to be the same partial wall that Dakota used when he attempted suicide on December 17, 2019 in the Terry County Jail by hanging,

which Defendant Click knew about, and Defendant Click knew that Dakota's cell was not being monitored via video monitoring because he was aware that the jail was understaffed and there was only one person in the picket responsible for monitoring over 90 cameras as well as performing a litany of other tasks which would take the person's focus away from monitoring cell video feeds.

310.    Thus, Defendant Click was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed. *Converse*, 961 F.3d at 775.

### **Defendant Click actually drew that inference.**

311.    Defendant Click actually drew the inference that Dakota was a serious risk of suicide because when Plaintiff Warren asked why they did not have Dakota on suicide watch which is what the family had previously been told that he was on, Defendant Click disagreed with Dakota being taken off suicide watch but that decision was not up to him but instead up to an MHMR worker per the protocols at the Terry County Jail – a policy which he creates and chose over other available policies, such as having a sliding scale like in the Collin County jail so that Dakota could have been removed from suicide watch but still been restricted access to ligatures such as his bed sheets which he used to commit suicide – and had previously used to attempt suicide by hanging on December 17, 2020 in the Terry County Jail and which Defendant Click was aware.

312.    Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious. *Farmer*, 511 U.S. at 842.

313.    Defendant Click's actual knowledge of the substantial risk can also be inferred because it was so obvious based on what Defendant Click knew. *Farmer*, 511 U.S. at 842.

314.   Thus, Defendant Click actually drew the inference that a substantial risk of serious harm existed.

315.   Accordingly, Defendant Click may be held liable for his acts or omissions that resulted in Dakota's suicide because he "had subjective knowledge of a substantial risk of harm to a pretrial detainee but responded with deliberate indifference to that risk" when he failed to ensure that Dakota was removed from the cell with ligatures and tie off points, or was monitored via video or more frequent face to face contacts. *Converse*, 961 F.3d at 775.

### **Defendant Peters was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed.**

125.   Defendant Peters was aware of and ignored obvious indicia of a risk of serious harm.

126.   Defendant Peters knew he was supposed to check on Dakota and fabricated those checks on the Check Sheet despite knowing that the checks did not occur – this was deliberate indifference to Dakota's health and safety.

127.   Defendant Peters knew that Dakota was at an elevated risk of harming himself as Defendant Peters monitored Dakota while he was on suicide watch on January 15, 2021 and January 16, 2021 following his suicide attempt by cutting his wrists, as is shown by the notations on the Special Observation Log where Defendant Peters initialed making thirty-three separate observations of Dakota while he was on suicide watch. Additionally, Defendant Peters knew that Dakota was in a segregation cell.

128.   Furthermore, Dakota had been in the Terry County jail since November 5, 2020 and had either been in segregation or a suicide watch holding cell the entire time as a result of his severe mental health issues which caused him to attempt suicide three times in the jail prior to his February 26, 2021 suicide. Upon information and belief, discovery will reveal evidence that

supports Defendant Peters was aware of Dakota's mental health issues and his previous suicide attempts as a result of the amount of time Dakota had been in the jail, the serious nature of his incidents, and Chapter 273.5 of the Terry County Jail written Policy, which states, "Information regarding mentally disabled or suicidal inmates will be passed on from the jailer on duty to the oncoming jailer by verbal communication and by written reports. Notations of a mentally disabled or potentially suicidal inmate will be made in the Jail Pass On notebook by the Sergeant or Jailer on duty. If an incident occurs, the jailer on duty will complete an incident report. All information will be passed on to the oncoming jailer." This policy would have resulted in Defendant Peters learning about Dakota's mental health issues and his suicide attempts.

129.    Upon information and belief, discovery into evidence in the possession of Defendants will result in information and evidence supporting Defendant Peters was aware of Rodney Howard's suicide in the Terry County Jail on September 12, 2019 in a segregation cell by hanging himself using the partial wall in his cell as the gallows, following numerous suicide attempts in the Terry County Jail. This information would have been provided to Terry County Jailers during trainings to prevent the same issue that resulted in Rodney Howard's death. Thus, Defendant Peters was aware that inmates who attempted suicide multiple times in the Terry County Jail and were housed in a segregation cell had an opportunity to do so again using the partition wall as his gallows.

130.    Despite all of this information, Defendant Peters intentionally refused to check on Dakota, going as far as walking by his cell or dropping a tray at his food port hatch and not even attempting to look inside of the cell.

131.    Despite all of this information, Defendant Peters lied on his cell Check Sheet by stating checks were made on Dakota that video evidence proves did not happen.

132.    Defendant Peters lied on his cell Check Sheet because he knew that he needed to check on Dakota.

133.    Thus, this is not simply negligence, but rises to deliberate indifference to Dakota's health and safety by refusing to check on him knowing he was a risk to his own health and safety due to everything that had happened with Dakota in the jail to date.

134.    Thus, Defendant Peters was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed. *Converse*, 961 F.3d at 775.

**Defendant Peters actually drew that inference.**

135.    Defendant Peters actually drew the inference that there was substantial risk of suicide with Dakota due to knowing that Dakota had attempted suicide three times in the jail, was being held in segregation in a segregation cell, was not being held on suicide watch and had access to ligatures including bed sheets like he used to attempt suicide in December of 2020, was house in the same type of cell that he attempted suicide in 2020 by hanging, was housed in the same type of cell that Rodney Howard was housed in when he committed suicide by hanging, knew that Dakota wasn't being monitored via camera footage in his cell due to the jail being understaffed and there being only one person to look at over 90 cameras while doing other tasks, knew that the cameras were only used as a supplement when asked by a jailer due to the jail being understaffed as indicated by Dominque Dominguez in her affidavit, knew no other jailers were checking on Dakota, knew that it had been hours since Dakota had been check on, knew that he was supposed to be checking on Dakota because of his suicidal history in the jail,  his mental health issues, and his being housed in a segregation cell, and that he was required to document the checks which is why he fabricated the checks on his Check Sheet.

136.    Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious. *Farmer*, 511 U.S. at 842.

137.    Defendant Peters' actual knowledge of the substantial risk can be inferred because it was so obvious based off of all the information Defendant Peters knew.

138.    Thus, Defendant Peters actually drew the inference that a substantial risk of serious harm existed.

139.    Accordingly, Defendant Peters may be held liable for his acts or omissions that resulted in Dakota's suicide because he "had subjective knowledge of a substantial risk of harm to a pretrial detainee but responded with deliberate indifference to that risk" when he failed to ensure that Dakota was safe despite being housed in a cell with ligatures and tie off points, while he was not being monitored via video or more frequent face to face contacts. *Converse*, 961 F.3d at 775.

**Defendant Jacquez was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed.**

140.    Defendant Jacquez was aware of and ignored obvious indicia of a risk of serious harm.

141.    Defendant Jacquez knew he was supposed to check on Dakota and completely ignored Dakota even when walking by his cell – this was deliberate indifference to Dakota's health and safety.

142.    Defendant Jacquez knew that Dakota was at an elevated risk of harming himself as Defendant Jacquez responded to Dakota's cell on January 15, 2021 when Dakota attempted suicide by cutting his wrists where he was then placed on suicide watch. Defendant Jacquez then monitored Dakota while he was on suicide watch on January 16, 2021, as is shown by the notations

on the Special Observation Log where Defendant Jacquez initialed making three separate observations of Dakota while he was on suicide watch. Additionally, Defendant Jacquez knew that Dakota was in a segregation cell.

143.    Furthermore, Dakota had been in the Terry County jail since November 5, 2020 and had either been in segregation or a suicide watch holding cell the entire time as a result of his severe mental health issues which caused him to attempt suicide three times in the jail prior to his February 26, 2021 suicide. Upon information and belief, discovery will reveal evidence that supports Defendant Jacquez was aware of Dakota's mental health issues and his previous suicide attempts as a result of the amount of time Dakota had been in the jail, the serious nature of his incidents, and Chapter 273.5 of the Terry County Jail written Policy, which states, "Information regarding mentally disabled or suicidal inmates will be passed on from the jailer on duty to the oncoming jailer by verbal communication and by written reports. Notations of a mentally disabled or potentially suicidal inmate will be made in the Jail Pass On notebook by the Sergeant or Jailer on duty. If an incident occurs, the jailer on duty will complete an incident report. All information will be passed on to the oncoming jailer." This policy would have resulted in Defendant Jacquez learning about Dakota's mental health issues and his suicide attempts.

144.    Upon information and belief, discovery into evidence in the possession of Defendants will result in information and evidence supporting Defendant Jacquez was aware of Rodney Howard's suicide in the Terry County Jail on September 12, 2019 in a segregation cell by hanging himself using the partial wall in his cell as the gallows, following numerous suicide attempts in the Terry County Jail. This information would have been provided to Terry County Jailers during trainings to prevent the same issue that resulted in Rodney Howard's death and Defendant Jacquez was employed as a jailer at the Terry County Jail at the time that Rodney

Howard committed suicide. Thus, Defendant Jacquez was aware that inmates who attempted suicide multiple times in the Terry County Jail and were housed in a segregation cell had an opportunity to do so again using the partition wall as his gallows.

145.    Despite all of this information, Defendant Jacquez intentionally refused to check on Dakota, going as far as walking by his cell multiple times or opening his food port hatch and not even attempting to look inside of the cell.

146.    Thus, this is not simply negligence, but rises to deliberate indifference to Dakota's health and safety by refusing to check on him knowing he was a risk to his own health and safety due to everything that had happened with Dakota in the jail to date.

147.    Thus, Defendant Jacquez was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed. *Converse*, 961 F.3d at 775.

**Defendant Jacquez actually drew that inference.**

148.    Defendant Jacquez actually drew the inference that there was substantial risk of suicide with Dakota due to knowing that Dakota had attempted suicide three times in the jail, was being held in segregation in a segregation cell, was not being held on suicide watch and had access to ligatures including bed sheets like he used to attempt suicide in December of 2020, was house in the same type of cell that he attempted suicide in 2020 by hanging, was housed in the same type of cell that Rodney Howard was housed in when he committed suicide by hanging, knew that Dakota wasn't being monitored via camera footage in his cell due to the jail being understaffed and there being only one person to look at over 90 cameras while doing other tasks, knew that the cameras were only used as a supplement when asked by a jailer due to the jail being understaffed as indicated by Dominque Dominguez in her affidavit, knew no other jailers were checking on Dakota, knew that it had been hours since Dakota had been check on, and knew that he was

supposed to be checking on Dakota because of his suicidal history in the jail, his mental health issues, and his being housed in a segregation cell.

149.    Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious. *Farmer*, 511 U.S. at 842.

150.    Defendant Jacquez' actual knowledge of the substantial risk can be inferred because it was so obvious based off of all the information Defendant Jacquez knew.

151.    Thus, Defendant Jacquez actually drew the inference that a substantial risk of serious harm existed.

152.    Accordingly, Defendant Jacquez may be held liable for his acts or omissions that resulted in Dakota's suicide because he "had subjective knowledge of a substantial risk of harm to a pretrial detainee but responded with deliberate indifference to that risk" when he failed to ensure that Dakota was safe despite being housed in a cell with ligatures and tie off points, while he was not being monitored via video or more frequent face to face contacts. *Converse*, 961 F.3d at 775.

**Defendant Faulkner, alternatively, Defendant Ramirez, alternatively, Defendant Morales, alternatively, Defendant McElfresh, alternatively, Defendant Moya, alternatively, Defendant Collazo, alternatively, Defendant Clark, and alternatively, Defendant Faubion (1) was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed and (2) actually drew that inference.**

316.    There is no question that Defendant Faulkner, alternatively, Defendant Ramirez, alternatively, Defendant Morales, alternatively, Defendant McElfresh, alternatively, Defendant Moya, alternatively, Defendant Collazo, alternatively, Defendant Clark, and alternatively, Defendant Faubion, as a medical professional treating a pretrial detainee on behalf of a

governmental entity, was acting under color of state law for purposes of § 1983. *Sanchez v. Oliver*, 995 F.3d 461, 466 (5th Cir. 2021).

317.    Defendant Faulkner, alternatively, Defendant Ramirez, alternatively, Defendant Morales, alternatively, Defendant McElfresh, alternatively, Defendant Moya, alternatively, Defendant Collazo, alternatively, Defendant Clark, and alternatively, Defendant Faubion was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed and actually drew that inference was aware of and ignored obvious indicia of a risk of serious harm.

318.    Upon information and belief, after a reasonable opportunity for further investigation or discovery evidentiary support will establish that Defendant Faulkner, alternatively, Defendant Ramirez, alternatively, Defendant Morales, alternatively, Defendant McElfresh, alternatively, Defendant Moya, alternatively, Defendant Collazo, alternatively, Defendant Clark, and alternatively, Defendant Faubion was the mental health provider that removed Dakota from suicide watch on February 8, 2021, as each of these Defendants conducted evaluations and/or assessments of Dakota during his incarceration in the Terry County Jail and continuity of care would dictate that Dakota be seen by the same mental health professionals when possible. Fed. R. Civ. P. 11(b)(3).

319.    When removing Dakota from suicide watch on February 8, 2021, Defendant Faulkner, alternatively, Defendant Ramirez, alternatively, Defendant Morales, alternatively, Defendant McElfresh, alternatively, Defendant Moya, alternatively, Defendant Collazo, alternatively, Defendant Clark, and alternatively, Defendant Faubion had access to Dakota's file which included each of the assessments and evaluations done on Dakota while he was in the Terry County Jail as they would be part of his mental health file and each one was done by mental health

personnel from West Texas Centers where Defendant Faulkner, alternatively, Defendant Ramirez, alternatively, Defendant Morales, alternatively, Defendant McElfresh, alternatively, Defendant Moya, alternatively, Defendant Collazo, alternatively, Defendant Clark, and alternatively, Defendant Faubion works.

320.    Accordingly, when removing Dakota from suicide watch on February 8, 2021, Defendant Faulkner, alternatively, Defendant Ramirez, alternatively, Defendant Morales, alternatively, Defendant McElfresh, alternatively, Defendant Moya, alternatively, Defendant Collazo, alternatively, Defendant Clark, and alternatively, Defendant Faubion knew that since being booked into the Terry County Jail on November 5, 2020, Dakota had attempted suicide three separate times by (1) hanging himself with two bedsheets in December 2020 necessitating suicide watch; (2) cutting his wrists on January 15, 2021 necessitating suicide watch; and (3) overdosing on Trazodone on February 5, 2020 which necessitated his current suicide watch.

321.    Access to his file, evaluations, and assessments would also have given Defendant Faulkner, alternatively, Defendant Ramirez, alternatively, Defendant Morales, alternatively, Defendant McElfresh, alternatively, Defendant Moya, alternatively, Defendant Collazo, alternatively, Defendant Clark, and alternatively, Defendant Faubion the information that on February 5, 2021, Dakota learned that (1) he had been indicted on capital murder charges; (2) his mother had COVID; and (3) his aunt had passed away – which are all triggers which could cause someone to commit suicide and which actually did cause Dakota to overdose on Trazodone three days prior necessitating a trip to the hospital and suicide watch.

322.    Access to his file, evaluations, and assessments would also have given Defendant Faulkner, alternatively, Defendant Ramirez, alternatively, Defendant Morales, alternatively, Defendant McElfresh, alternatively, Defendant Moya, alternatively, Defendant Collazo,

alternatively, Defendant Clark, and alternatively, Defendant Faubion the information that Dakota had been diagnosed with Major Depressive Disorder, which was characterized as severe, and continuously heard voices in his head telling him to injure and kill himself – which he implicated in his previous suicide attempts, and which had not gone away as of February 8, 2021.

323.    Access to his file, evaluations, and assessments would also have given Defendant Faulkner, alternatively, Defendant Ramirez, alternatively, Defendant Morales, alternatively, Defendant McElfresh, alternatively, Defendant Moya, alternatively, Defendant Collazo, alternatively, Defendant Clark, and alternatively, Defendant Faubion the information that as recently as February 5, 2021, Dakota reported that he stopped taking his medication, he has two voices that tell him to stop taking his medication, and he stated the voices are always there but when I get anxious they get louder.

324.    Access to his file, evaluations, and assessments would also have given Defendant Faulkner, alternatively, Defendant Ramirez, alternatively, Defendant Morales, alternatively, Defendant McElfresh, alternatively, Defendant Moya, alternatively, Defendant Collazo, alternatively, Defendant Clark, and alternatively, Defendant Faubion the information that as recently as February 5, 2021, Dakota reported that he did not believe his medication was working.

325.    All of these things put Defendant Faulkner, alternatively, Defendant Ramirez, alternatively, Defendant Morales, alternatively, Defendant McElfresh, alternatively, Defendant Moya, alternatively, Defendant Collazo, alternatively, Defendant Clark, and alternatively, Defendant Faubion on notice that Dakota's suicidal ideations were not improving and he was a risk of harming or killing himself.

326.    As a result of Defendant Faulkner, alternatively, Defendant Ramirez, alternatively, Defendant Morales, alternatively, Defendant McElfresh, alternatively, Defendant Moya,

alternatively, Defendant Collazo, alternatively, Defendant Clark, and alternatively, Defendant Faubion's experience with the Terry County Jail, Defendant Faulkner, alternatively, Defendant Ramirez, alternatively, Defendant Morales, alternatively, Defendant McElfresh, alternatively, Defendant Moya, alternatively, Defendant Collazo, alternatively, Defendant Clark, and alternatively, Defendant Faubion was aware that by removing Dakota from suicide watch he would be placed into a cell with access to ligatures, tie off points, and less monitoring than if he were in a holding cell on suicide watch.

327.    Despite this information, Defendant Faulkner, alternatively, Defendant Ramirez, alternatively, Defendant Morales, alternatively, Defendant McElfresh, alternatively, Defendant Moya, alternatively, Defendant Collazo, alternatively, Defendant Clark, and alternatively, Defendant Faubion removed Dakota from suicide watch, knowing he would be placed into a cell with sheets, which were the same ligature he had used to attempt to hang himself in December 2020 in the Terry County Jail, and tie off points.

328.    Thus, Defendant Faulkner, alternatively, Defendant Ramirez, alternatively, Defendant Morales, alternatively, Defendant McElfresh, alternatively, Defendant Moya, alternatively, Defendant Collazo, alternatively, Defendant Clark, and alternatively, Defendant Faubion was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed and actually drew that inference was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed. *Converse*, 961 F.3d at 775.

329.    Defendant Faulkner, alternatively, Defendant Ramirez, alternatively, Defendant Morales, alternatively, Defendant McElfresh, alternatively, Defendant Moya, alternatively, Defendant Collazo, alternatively, Defendant Clark, and alternatively, Defendant Faubion actually

drew the inference that there was substantial risk of suicide with Rodney due to the information outlined in paragraphs 318-327, *supra*.

330.    Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious. *Farmer*, 511 U.S. at 842.

331.    Defendant Faulkner, alternatively, Defendant Ramirez, alternatively, Defendant Morales, alternatively, Defendant McElfresh, alternatively, Defendant Moya, alternatively, Defendant Collazo, alternatively, Defendant Clark, and alternatively, Defendant Faubion's actual knowledge of the substantial risk can be inferred because it was so obvious based off of the information each of them knew at the time the order to remove Dakota from suicide watch was given.

332.    Thus, Defendant Faulkner, alternatively, Defendant Ramirez, alternatively, Defendant Morales, alternatively, Defendant McElfresh, alternatively, Defendant Moya, alternatively, Defendant Collazo, alternatively, Defendant Clark, and alternatively, Defendant Faubion actually drew the inference that a substantial risk of serious harm existed.

333.    Knowing all of this, Defendant Faulkner, alternatively, Defendant Ramirez, alternatively, Defendant Morales, alternatively, Defendant McElfresh, alternatively, Defendant Moya, alternatively, Defendant Collazo, alternatively, Defendant Clark, and alternatively, Defendant Faubion shockingly directed that Rodney be taken off suicide watch on February 8, 2021 where he would be moved to a segregation cell with ligatures and tie off points.

334.    Accordingly, Defendant Faulkner, alternatively, Defendant Ramirez, alternatively, Defendant Morales, alternatively, Defendant McElfresh, alternatively, Defendant Moya,

alternatively, Defendant Collazo, alternatively, Defendant Clark, and alternatively, Defendant Faubion may be held liable for acts or omissions that resulted in Dakota's suicide because of having "subjective knowledge of a substantial risk of harm to a pretrial detainee but responded with deliberate indifference to that risk" when directing that Dakota be removed from suicide watch on February 8, 2021. *Converse*, 961 F.3d at 775; *Sanchez v. Oliver*, 995 F.3d 461, 475 (5th Cir. 2021); *Wynn v. Harris Cnty., Texas*, 556 F. Supp. 3d 645, 655 (S.D. Tex. 2021).

335.    Additionally, because Defendant Faulkner, alternatively, Defendant Ramirez, alternatively, Defendant Morales, alternatively, Defendant McElfresh, alternatively, Defendant Moya, alternatively, Defendant Collazo, alternatively, Defendant Clark, and alternatively, Defendant Faubion was a private medical practitioner that worked with MHMR through independent contractor relationships, Defendant Faulkner, alternatively, Defendant Ramirez, alternatively, Defendant Morales, alternatively, Defendant McElfresh, alternatively, Defendant Moya, alternatively, Defendant Collazo, alternatively, Defendant Clark, and alternatively, Defendant Faubion is not entitled to assert the defense of qualified immunity. *Sanchez*, 995 F.3d at 472; *Wynn*, 556 F. Supp. 3d at, 653-54; *Cabler v. Red River Cnty., Texas*, No. 5:21CV12-RWS-CMC, 2022 WL 950886, at *18–19 (E.D. Tex. Mar. 2, 2022), *report and recommendation adopted*, No. 521CV00012RWSCMC, 2022 WL 946014 (E.D. Tex. Mar. 29, 2022).

## Count Three

### WRONGFUL DEATH
### Against All Defendants

336.    Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs as if fully repeated herein.

337.    Plaintiff Stephanie Robertson is Dakota Brannen's adoptive mother.

338.    Plaintiff Bob Brannen is Dakota Brannen's adoptive father.

339.   Plaintiff Casondra Warren is Dakota Brannen's biological mother.

340.   By reason of Defendant Terry County's deliberately indifferent policies, practices, and customs, which resulted in Dakota's pain, suffering, and death, Defendant Terry County is liable for damages.

341.   By reason of Defendants Peters, Jacquez, Faulkner, Ramirez, Morales, Moya, Collazo, Clark, and Faubion's wrongful conduct of failing to protect Dakota despite his clear and obvious need for protection due to his signs and symptoms demonstrating an imminent threat of serious harm without said protection, Defendants Peters, Jacquez, Faulkner, Ramirez, Morales, Moya, Collazo, Clark, and Faubion are liable for damages.

342.   To recover on a wrongful death claim under 42 U.S.C. § 1983, a plaintiff who has standing must show both (1) the alleged constitutional deprivation required by 42 U.S.C. § 1983 and (2) the causal link between the defendant's unconstitutional acts or omissions and the death of the victim.

343.   Defendant Terry County's deliberate indifference, as described herein, caused the deliberate indifference shown toward Dakota, which violated Dakota Brannen's Constitutional rights under the Fourteenth Amendment and caused his death.

344.   Defendant Terry County's conduct that caused Dakota's death was a producing cause of injury, which resulted in the following damages: loss of a family relationship, love, support, services, emotional pain and suffering, and Defendant Terry County is liable for its actions and inactions and infliction of emotional distress caused by the wrongful death of Dakota.

345.   Defendants Peters, Jacquez, Faulkner, Ramirez, Morales, Moya, Collazo, Clark, and Faubion's deliberate indifference shown toward Dakota's health and safety, as described

herein, violated Dakota's constitutional rights under the Fourteenth Amendment and caused his death.

346.    Defendants Peters, Jacquez, Faulkner, Ramirez, Morales, Moya, Collazo, Clark, and Faubion's conduct that caused Dakota's death was a producing cause of injury, which resulted in the following damages: loss of a family relationship, love, support, services, emotional pain and suffering, and Defendants Peters, Jacquez, Faulkner, Ramirez, Morales, Moya, Collazo, Clark, and Faubion are liable for their acts and infliction of emotional distress caused by the wrongful death of Dakota.

347.    Plaintiffs seek compensation as set forth more specifically in the section of this Complaint entitled "Damages."

**Count Four**

**SURVIVAL ACTION**
**Against All Defendants**

348.    Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs as if fully repeated herein.

349.    Plaintiff Stephanie Robertson brings this claim as the Administrator of the Estate of Dakota Brannen.

350.    Dakota died because of the Defendants' wrongful conduct outlined in this lawsuit.

351.    Dakota would have been entitled to bring this action against the Defendants if he had lived.

352.    The Decedent's right of action for wrongful conduct against the Defendants survives in favor of the estate of the deceased.

353.    The Defendants are liable to the Estate of the deceased for the loss of Dakota's life, pain and suffering, and the violation of his constitutional rights.

354.    Plaintiffs seek compensation as set forth more specifically in the section of this Complaint entitled "Damages."

## V.
## PUNITIVE DAMAGES

355.    Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs as if fully repeated herein.

356.    When viewed objectively from the standpoint of the Individual Defendants, at the time of the occurrence, their conduct involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others.

357.    As a direct, proximate, and producing cause and the intentional, egregious, malicious conduct by the Individual Defendants, Plaintiff is entitled to recover punitive damages in an amount within the jurisdictional limits of this Court.

## VI.
## DAMAGES

358.    Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs as if fully repeated herein.

359.    Plaintiffs' injuries were a foreseeable event. Those injuries were directly and proximately caused by the Defendants' deliberate indifference shown toward Dakota Brannen and their unconstitutional policies applied against Dakota Brannen.

360.    As a result, Plaintiffs are entitled to recover all actual damages allowed by law. Plaintiffs contend the Individual Defendants' conduct constitutes malice, evil intent, or reckless or callous indifference to Dakota's constitutionally protected rights. Thus, Plaintiffs are entitled to punitive damages against the Individual Defendants.

361. As a direct and proximate result of the occurrence which made the basis of this lawsuit, Dakota's estate brings claims for the following damages:

    a. Actual damages;

    b. Loss of affection, consortium, comfort, financial assistance, protection, and care;

    c. Pain and suffering and mental anguish suffered by Dakota prior to his death;

    d. Mental anguish and emotional distress suffered by Plaintiffs;

    e. Loss of quality of life;

    f. Funeral and burial expenses;

    g. Loss of service;

    h. Loss of earnings and contributions to Plaintiffs;

    i. Prejudgment interest; and

    j. Post judgment interest.

362. Pursuant to 42 U.S.C. § 1983 and 1988, Plaintiffs seek to recover, and hereby request the award of punitive damages, reasonable attorney's fees, and costs of court.

## VII.
## ATTORNEY'S FEES

363. If Plaintiffs prevail in this action, by settlement or otherwise, Plaintiffs are entitled to and hereby demand attorney's fees under 42 U.S.C. §1988.

## VIII.
## JURY REQUEST

364. Plaintiffs respectfully request a jury trial.

## **PRAYER**

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that judgment be rendered against Defendants, for an amount in excess of the jurisdictional minimum of this Court. Plaintiffs further pray for all other relief, both legal and equitable, to which they may show themselves justly entitled.

Respectfully submitted,

*/s/ Scott H. Palmer*
SCOTT H. PALMER,
Texas Bar No. 00797196

*/s/ James P. Roberts*
JAMES P. ROBERTS,
Texas Bar No. 24105721

*/s/ Breanta Boss*
BREANTA BOSS,
Texas Bar No. 24115768

SCOTT H. PALMER, P.C.
15455 Dallas Parkway, Suite 540
Addison, Texas 75001
Telephone: 214.987.4100
Facsimile: 214.922.9900
scott@scottpalmerlaw.com
james@scottpalmerlaw.com
breana@scottpalmerlaw.com

COUNSEL FOR PLAINTIFF